# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

| | |
|---|---|
| DAMON YOUNG, | |
| Plaintiff, | CIVIL ACTION NO.: 6:17-cv-131 |
| v. | |
| DEPUTY WARDEN SMITH; MARTY ALLEN; DEPUTY WARDEN BOBBIT; UNIT MANAGER HUTCHINSON; DEPUTY WARDEN AARON PINEIRO; LT. SHOEMAKE; MENTAL HEALTH DIRECTOR RENO; COUNSELOR MARSHA GILLIS; and DR. JAMES DeGROOT,[1] | |
| Defendants. | |

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, an inmate at Georgia State Prison in Reidsville, Georgia, filed the above-captioned action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.*, contesting certain conditions of his confinement. (Docs. 1, 12.) Plaintiff also filed and was granted a Motion for Leave to Proceed *in Forma Pauperis*. (Docs. 2, 5.) For the reasons and in the manner set forth below, I find Plaintiff plausibly states colorable: RLUIPA injunctive relief claims; First Amendment free exercise, establishment clause, and retaliation claims; Fourteenth Amendment equal protection and due process claims; Sections 1983 and 1985 conspiracy claims; and Eighth Amendment deliberate indifference to serious medical needs claims. The Court **DIRECTS** the United States

---

[1] Plaintiff names Defendants Shoemake, Pineiro, Reno, Gillis, and DeGroot as additional Defendants, (doc. 12), and, as discussed at length below, the Court finds Plaintiff to have stated colorable, properly joined claims for relief only against Defendants Shoemake and Pineiro. Accordingly, the Court **DIRECTS** and **AUTHORIZES** the Clerk of Court to update the docket and record of this case with the addition of Defendants Shoemake and Pineiro.

Marshal to serve all named Defendants with a copy of this Order and Plaintiff's Complaint, (docs. 1, 12).

However, I **RECOMMEND** the Court **DENY** Plaintiff's requests for Preliminary Injunctions and his Motion for Law Library Access, (docs. 1, 9, 12), and **DISMISS** Plaintiff's: official capacity monetary damages claims; personal property loss claims; RLUIPA compensatory and punitive damages claims; American Indian Religious Freedom Act ("AIRFA") claims; 42 U.S.C. § 1986 conspiracy claims; First Amendment access-to-courts claims; Fourteenth Amendment retaliation claims; and Eighth Amendment conditions of confinement claims. Further, I **RECOMMEND** the Court **DISMISS without prejudice** Plaintiff's First Amendment, Fourteenth Amendment, and conspiracy claims for compensatory and punitive damages. The Court should **DENY** Plaintiff leave to appeal *in forma pauperis* as to his claims. Lastly, the Court **DISMISSES as moot** Plaintiff's Motion for an Update on Complaint, (doc. 13).

## BACKGROUND[2]

Plaintiff filed his initial Complaint on October 2, 2017. (Doc. 1.) After being granted *in forma pauperis* status, (doc. 5), Plaintiff filed a Notice of Intent to Request Leave to File an Amended Complaint, (doc. 8).[3] In his Notice, Plaintiff detailed several defendants and claims he

---

[2] The below recited facts are taken from Plaintiff's Complaint as supplemented and are accepted as true, as they must be at this stage.

[3] Plaintiff's Notice, as stated at the top of his filing, was incorrectly docketed as a Motion rather than a Notice. (Doc. 8.) In addition, Plaintiff's later filed Amended Complaint refers to this earlier pleading as his Notice to the Court and Defendants and shows a good faith basis to amend his Complaint. (Doc. 12, p. 1.) Accordingly, to appropriately reflect the contents of Plaintiff's Notice filing, Court **DIRECTS** and **AUTHORIZES** the Clerk of Court to update the docket and record of this case and docket Plaintiff's pleading, (doc. 8), as a "Notice of Intent to Request Leave to File an Amended Complaint" rather than as a Motion. Additionally, the Court **AUTHORIZES AND DIRECTS** the Clerk of Court to docket Plaintiff's actual Motion, (doc. 12), as "Plaintiff's First Motion to Amend/Correct Complaint."

wished to add to his original complaint and stated that he would file his amended complaint on March 1, 2018, once the grievances related to those additional claims and defendants were exhausted. (Id.) Plaintiff filed a Motion for Law Library Access contemporaneous with his Notice. (Doc. 9.) On March 2, 2018, Plaintiff duly filed his Motion for Leave to file an Amended Complaint and his Amended Complaint.[4] (Doc. 12.) In addition, Plaintiff has filed a Motion for an Update on Complaint. (Doc. 13.)

In his Complaint, as supplemented, Plaintiff levies eleven sets of claims against a number of named Defendants and proposed Defendants. (Docs. 1, 12.) The focus of Plaintiff's Complaint is the alleged violation of his religious exercise rights and punishment he faced for attempting to exercise those rights; Plaintiff also includes claims regarding deficient medical treatment for inmates who have mental health needs. To that end, Plaintiff alleges claims arising from two Georgia prisons—Smith State Prison in Glennville, Georgia, and Georgia State Prison in Reidsville, Georgia, both of which are in Tattnall County. (Id.)

Plaintiff, an adherent of a Native American religion, asserts that beginning on October 27, 2016, Defendant Deputy Warden Smith violated Plaintiff's First Amendment free exercise, Fourteenth Amendment equal protection, RLUIPA, and AIRFA rights by denying Plaintiff access to kinnikinnick,[5] a "Native American sacred religious item[]." Plaintiff had

---

[4] Plaintiff moved for leave to file an Amended Complaint, however, he may amend his Complaint once as a matter of right. Fed. R. Civ. P. 15(a). Although Plaintiff styles his new claims as an Amended Complaint, (doc. 12), it is clear that he seeks to supplement his original Complaint with additional claims and Defendants rather than replacing his original Complaint with an amended one. See Lowery v. Ala. Power Co., 483 F.3d 1184, 1187 (11th Cir. 2007) ("[A]n amended complaint supersedes the initial complaint and becomes the operative pleading in the case."). Accordingly, the Court **GRANTS** Plaintiff's Motion and **DIRECTS** the Clerk of Court to enter Plaintiff's proposed Amended Complaint, (doc. 12), on the docket and record of this case as "Plaintiff's Supplement to Complaint" and to denote it a supplemental pleading to Plaintiff's Complaint, (doc. 1). The operative pleading in this case shall be Plaintiff's Complaint and the Supplement thereto.

[5] Kinnikinnick is a Native American herbal and tobacco smoking blend often used in spiritual ceremonies. Federal Bureau of Prisons, Practice Guidelines for Administration of Inmate Religious

approvingly used kinnikinnick in his weekly prayer services for two months while at Smith State Prison. (Doc. 1, p. 6.) Plaintiff alleges that he was permitted to use kinnikinnick, supplied by vendor Crazy Crow Trading Post, for over six years as an inmate until Defendant Smith confiscated it, along with Plaintiff's pipe, as retaliation for his filing grievances. (Id. at p. 7.) Defendant Smith reportedly told Plaintiff that his Native American religious items were no longer approved because other inmates sought to use kinnikinnick as part of their Native American religious practice. (Id.)

In January 2017, Defendant Smith had Plaintiff transferred to Georgia State Prison because Smith State Prison lacked sufficient mental health services. (Id. at p. 8.) Before Plaintiff's transfer, Defendant Smith disposed of Plaintiff's remaining kinnikinnick rather than letting him take it with him or mail it home, as provided for by the Georgia Department of Corrections's Standard Operating Procedure ("SOP"). In addition, Defendant Smith relayed to Plaintiff that he had called Defendant Allen, the warden at Georgia State Prison, and told Defendant Allen "all about [Plaintiff] and that he would not be allowed to smoke over there either." (Id.) Plaintiff alleges Defendants Smith and Allen's actions constitute a conspiracy under 42 U.S.C. §§ 1985 & 1986 to deny him his statutory and constitutional religious and equal protection rights. (Id.) Upon arrival at Georgia State Prison, Defendant Allen confirmed to Plaintiff that he had spoken with Defendant Smith and that Plaintiff would not be allowed to possess any kinnikinnick unless the vendor provided a list of ingredients, even though Plaintiff's vendor had been approved for six years. (Id. at p. 9.)

---

Beliefs and Practices, T5360.01, p. 11 (2002) (detailing the religious meaning of kinninnick and noting that institutional use of it is limited to the chapel area or another area designated by the chaplain), http://www.acfsa.org/documents/dietsReligious/FederalGuidelinesInmateReligiousBeliefsandPractices032702.pdf.

One week later, Defendant Hutchinson attempted to force Plaintiff to sign a form stating Plaintiff was transferred for mental health reasons and had been given a Tier II 90-day review hearing that continued Plaintiff's placement in Phase 1 of the Tier II program. Plaintiff, however, had not been given any hearing and refused to sign the form. (Id. at pp. 8–9.) Plaintiff asserts Defendant Hutchinson's actions violated SOP requirements concerning Tier II hearings and status review. (Id. at pp. 9–10.) Nonetheless, Plaintiff was placed in a Tier II cell where he has been subjected to severe restrictions, including a toilet he cannot flush, little if any yard time, no books besides the Bible or Koran, no personal property, no newspapers or other media, no educational materials, and very little human contact. (Id. at pp. 10–11.) Defendant Hutchinson's actions, Plaintiff avers, violated his Eighth and Fourteenth Amendment rights. (Id. at p. 11.)

In March 2017, Defendants Allen, Bobbit, and Hutchinson retaliated against Plaintiff for filing grievances and confiscated Plaintiff's Native American religious books and catalogs as well as other items. (Id. at pp. 11–12.) Defendant Allen told Plaintiff that he could not have any Native American religious items while in Tier II, only the Bible or Koran. (Id. at p. 12.) Defendants Bobbit and Hutchinson also precluded Plaintiff from utilizing his sacred religious items, which were stored in the property room, in his weekly prayer ceremonies. (Id. at pp. 12–13.) Plaintiff avers these Defendants' retaliation and other actions violated his freedom of religion and equal protection rights, among others. Plaintiff also contends Defendant Allen violated these same rights when he denied Plaintiff from receiving kinnikinnick and a "Buffalo Skull" blanket, which Plaintiff states came in a preapproved mail package. (Id.)

In July 2017, Plaintiff first requested, and received, permission to take the paralegal course from Defendants Allen, Hutchinson, and Pineiro. (Doc. 12, pp. 7–10.) However, once the course arrived at Georgia State Prison, these Defendants did not allow Plaintiff to possess it

and required he send it back. Plaintiff avers other inmates have been allowed to receive and take this same paralegal course. Plaintiff claims that Defendants Allen, Hutchinson, and Pineiro precluded him from taking this course in retaliation for his filing grievances and in denial of his equal protection rights. (Id.)

In August 2017, Plaintiff claims Defendants Allen, Hutchinson, Bobbit, and Shoemake came to his cell, took his property, and moved Plaintiff from Phase 3 of the Tier II program to Phase 1, the most restrictive phase, without affording Plaintiff due process.[6] (Id. at pp. 2–4.) While in Plaintiff's cell, Defendant Allen directed Defendants Hutchinson and Shoemake to have a hearing right then and to assign Plaintiff to Phase 1 due to a contraband violation, despite the fact that Plaintiff had received no disciplinary reports and was only forty-five days away from returning to general population. Defendant Allen also refused to authorize Plaintiff's paralegal college course. Plaintiff asserts these Defendants' actions violated the SOP and were done in retaliation for his religious beliefs and grievance filings. (Id.)

In addition, Plaintiff asserts deliberate indifference to serious medical needs claims against Defendants Reno, Gillis, DeGroot, Pinerio, and Allen. (Id. at pp. 5–7.) In short, Plaintiff alleges these Defendants have a custom or policy of providing constitutionally deficient mental health care to inmates. Plaintiff states that Georgia State Prison's mental health services are understaffed and inadequately trained, and do not comply with the SOP's requirements for providing consistent mental health care and counselling. Further, Plaintiff claims he and other inmates often receive no treatment and that what treatment is provided, such as crossword puzzles and Christian coping methods, are ineffective. These deficiencies have led inmates,

---

[6] Although Plaintiff does not explicitly when state he was moved to Phase 3 from Phase 1, his initial classification at Georgia State Prison in January 2017, (doc. 1, p. 9), it appears he was moved between these Phases during the period of time between January 2017 and August 2017, when he was returned to the most restrictive Phase 3.

including Plaintiff, to attempt suicide and have exacerbated Plaintiff's mental health problems. (Id.)  As relief for his claims, Plaintiff requests declaratory and injunctive remedies, as well as restitution, and nominal, compensatory, and punitive damages.  (Doc. 1, pp. 14–19; Doc. 12, pp. 10–12.)

## STANDARD OF REVIEW

Plaintiff brings this action *in forma pauperis*.  (Docs. 2, 3.)  Under 28 U.S.C. § 1915(a)(1), the Court may authorize the filing of a civil lawsuit without the prepayment of fees if the plaintiff submits an affidavit that includes a statement of all of his assets and shows an inability to pay the filing fee and also includes a statement of the nature of the action which shows that he is entitled to redress.  Even if the plaintiff proves indigence, the Court must dismiss the action if it is frivolous or malicious, or fails to state a claim upon which relief may be granted.  28 U.S.C. §§ 1915(e)(2)(B)(i)–(ii).  Additionally, pursuant to 28 U.S.C. § 1915A, the Court must review a complaint in which a prisoner seeks redress from a governmental entity. Upon such screening, the Court must dismiss a complaint, or any portion thereof, that is frivolous or malicious, or fails to state a claim upon which relief may be granted or which seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b).

When reviewing a complaint on an application to proceed *in forma pauperis*, the Court is guided by the instructions for pleading contained in the Federal Rules of Civil Procedure.  <u>See</u> Fed. R. Civ. P. 8 ("A pleading that states a claim for relief must contain [among other things] . . . a short and plain statement of the claim showing that the pleader is entitled to relief."); Fed. R. Civ. P. 10 (requiring that claims be set forth in numbered paragraphs, each limited to a single set of circumstances).  Further, a claim is frivolous under Section 1915(e)(2)(B)(i) "if it is 'without

arguable merit either in law or fact.'"  Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002) (quoting Bilal v. Driver, 251 F.3d 1346, 1349 (11th Cir. 2001)).

Whether a complaint fails to state a claim under Section 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Thompson v. Rundle, 393 F. App'x 675, 678 (11th Cir. 2010).  Under that standard, this Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A plaintiff must assert "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not" suffice.  Twombly, 550 U.S. at 555.  Section 1915 also "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless."  Bilal, 251 F.3d at 1349 (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

In its analysis, the Court will abide by the long-standing principle that the pleadings of unrepresented parties are held to a less stringent standard than those drafted by attorneys and, therefore, must be liberally construed.  Haines v. Kerner, 404 U.S. 519, 520 (1972); Boxer X v. Harris, 437 F.3d 1107, 1110 (11th Cir. 2006) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys . . . .") (quoting Hughes v. Lott, 350 F.3d 1157, 1160 (11th Cir. 2003)).  However, Plaintiff's unrepresented status will not excuse mistakes regarding procedural rules.  McNeil v. United States, 508 U.S. 106, 113 (1993) ("We have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.").

**DISCUSSION**

## I.    Denial of Preliminary Injunctions

Plaintiff requests thirteen forms of wide-ranging preliminary injunctive relief.  (Doc. 1, pp. 14–16; Doc. 8, p. 10.)   To be entitled to a temporary restraining order or preliminary injunction, a plaintiff must demonstrate: (1) a substantial likelihood of ultimate success on the merits; (2) that a restraining order or injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm that the restraining order or injunction would inflict on the other party; and (4) that the restraining order or injunction would not be adverse to the public interest.   Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005). Similarly, a plaintiff requesting a permanent injunction must satisfy the following four-factor test:

> (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  Thus, "[t]he standard for a permanent injunction is essentially the same as for a preliminary injunction except that the plaintiff must show actual success on the merits instead of a likelihood of success."  Siegel v. LePore, 234 F.3d 1163, 1213 (11th Cir. 2000) (Carnes, J., dissenting).   In either case, an "injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites."  Horton v. City of Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001).

If a plaintiff succeeds in making such a showing, then "the court may grant injunctive relief, but the relief must be no broader than necessary to remedy the constitutional violation."

Newman v. Alabama, 683 F.2d 1312, 1319 (11th Cir. 1982). Accordingly, where there is a constitutional violation in the prison context, courts traditionally are reluctant to interfere with prison administration and discipline, unless there is a clear abuse of discretion. See Procunier v. Martinez, 416 U.S. 396, 404–05 (1974) ("Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration [because] . . . courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."), *overruled on other grounds by* Thornburgh v. Abbott, 490 U.S. 401 (1989). In such cases, "[d]eference to prison authorities is especially appropriate." Newman, 683 F.2d at 1320–21 (reversing district court's injunction requiring release of prisoners on probation because it "involved the court in the operation of the State's system of criminal justice to a greater extent than necessary" and a less intrusive equitable remedy was available).

Plaintiff's requests for injunctive relief, some of which are related to his due process concerns while others are related to his religious liberty concerns, emanate from events occurring at both Smith State and Georgia State Prisons. (Doc. 1, pp. 14–16; Doc. 8, p. 10.) However, Plaintiff only seeks injunctive relief against Georgia State Prison officials, specifically Defendants Allen, Hutchinson, Bobbit, and Pineiro. In sum, Plaintiff asks the Court to order Defendants to release him from Tier II segregation, comply with the various provisions of the SOP, and allow Plaintiff to practice his Native American religion and take his paralegal course. (Id.) Looking to the substance of his requested preliminary relief, the Court finds that Plaintiff fails to establish that he faces an irreparable injury in the absence of his requested relief. Moreover, at this point, Plaintiff has not established a substantial likelihood of ultimate success on the merits of his various claims. Further, based on the current stage of proceedings, it would

be inappropriate for the Court to so greatly interfere with Defendants' prison administration in the manner Plaintiff seeks.

Accordingly, the Court should **DENY** Plaintiff's requests for preliminary injunction. This is not to say that Plaintiff may not obtain injunctive relief later in this proceeding, but at this time, the Court should not provide such an extraordinary remedy.

## II.     Denial of Motion for Law Library Access (Doc. 9)

Plaintiff's request that the Court grant him physical access to the law library essentially seeks preliminary injunctive relief.  Plaintiff's status as an inmate in long-term segregation precludes him from accessing the prison law library and requires that he provide case citations to prison officials in order to receive photocopies of legal materials.  (Doc. 9.)  However, because Plaintiff cannot access the law library, he does not know what citations to provide to prison officials, and he requests one hour of twice weekly access.  (Id.)

As detailed above, to be entitled to a temporary restraining order or preliminary injunction, a plaintiff must demonstrate: (1) a substantial likelihood of ultimate success on the merits; (2) that a restraining order or injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm that the restraining order or injunction would inflict on the other party; and (4) that the restraining order or injunction would not be adverse to the public interest.  Schiavo ex rel. Schindler, 403 F.3d at 1225–26.

To the extent Plaintiff attaches this Motion to the success of the claims laid out in his Complaint, the Court should **DENY** Plaintiff's Motion for Law Library access for the same reasons it should deny his requested preliminary injunctions, namely that Plaintiff fails to meet his burden of proof to establish irreparable injury and a substantial likelihood of success on the merit of his underlying claims.  Plaintiff's Motion states that prison officials are providing

indirect access to the law library during his Tier II confinement; further, his filings in this case, including the present Motion, show he has yet to face irreparable harm because they are well supported with citations to various legal authorities. Thus, Plaintiff cannot meet the irreparable injury requirement and no preliminary relief should issue. In the alternative, Plaintiff's Motion could be construed as attempting to state a separate access to courts claim.

"Access to the courts is clearly a constitutional right, grounded in the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." Chappell v. Rich, 340 F.3d 1279, 1282 (11th Cir. 2003) (citing Christopher v. Harbury, 536 U.S. 403, 415 n.12 (2002)). Prison authorities must provide inmates "with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977). However, to bring an access-to-courts claim, an inmate must establish that he suffered an actual injury. Lewis v. Casey, 518 U.S. 343, 349, 351 (1996) ("Bounds did not create an abstract, freestanding right to a law library or legal assistance . . . ."); see also Bass v. Singletary, 143 F.3d 1442, 1445 (11th Cir. 1998) (discussing actual injury requirement). Thus, to state an access-to-courts claim, a plaintiff must show "that an actionable claim . . . has been lost or rejected, or that the presentation of such a claim is currently being prevented").

In his Motion, Plaintiff does not allege enough to plausibly satisfy the actual injury prerequisite because he fails to show that his current claim has been lost or cannot be presented due to his law library restrictions. To the contrary, Plaintiff's Complaint remains before the Court, and he has been able to continue presenting his claims, despite not being granted the level of access to Georgia State Prison's law library that he desires. Plaintiff's allegations are not enough to satisfy the pleading requirements. Accordingly, the Court should **DISMISS** Plaintiff's putative access-to-courts claim for failure to state a claim upon which relief can be granted.

However, in an abundance of caution, the Court **DIRECTS** counsel for Defendants to contact the administration at Georgia State Prison within **fourteen days of counsel's receipt of this Order** to ensure that Plaintiff is receiving the access to legal materials and authorities that the Department of Corrections' SOP require an inmate such as Plaintiff receive. Defendants are reminded that "the fundamental constitutional right of access to the courts requires prison authorities to . . . provid[e] prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S. at 828. The Court offers no opinion as to whether Plaintiff has received inadequate access to legal materials to date. Nonetheless, the Court directs counsel to take this precautionary measure to ensure that Plaintiff has an opportunity to fairly litigate this action.

## III. Dismissal of Section 1983 Official Capacity Damages Claims

Plaintiff cannot sustain a Section 1983 claim for monetary damages against Defendants in their official capacities. States are immune from private suits pursuant to the Eleventh Amendment and traditional principles of state sovereignty. Alden v. Maine, 527 U.S. 706, 712–13 (1999). Section 1983 does not abrogate the well-established immunities of a state from suit without its consent. Will v. Mich. Dep't of State Police, 491 U.S. 58, 67 (1989). Because a lawsuit against a state officer in his official capacity is "no different from a suit against the [s]tate itself," such a defendant is immune from suit under Section 1983. Id. at 71. Here, the State of Georgia would be the real party in interest in a suit against Defendants in their official capacities as employees of the Georgia Department of Corrections. Accordingly, the Eleventh Amendment immunizes these actors from suit in their official capacities. See Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989). Without a waiver of that immunity, which is absent in

this case, Plaintiff cannot sustain any constitutional claims against Defendants in their official capacities for monetary relief. Thus, the Court should **DISMISS** these claims.

## IV.    Dismissal of Section 1983 Personal Property Loss Claims

Plaintiff brings several Section 1983 claims for the loss of his personal property—the sacred religious items and paralegal course, among other possessions—stemming from his transfer to Georgia State Prison and placement in Tier II segregation.  (Doc. 1, pp. 8, 12–13; Doc. 12, pp. 2–5, 7–10.)  A lost property claim implicates a plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.  <u>See</u> U.S. Const. amend. XIV ("[N]or shall any State deprive any person of . . . property, without due process of law . . . ."); <u>see also</u> <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992) ("The most familiar office of that Clause is to provide a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a state.")  Despite implicating the Due Process Clause, these claims fail.

Even if a state actor has continued to wrongfully retain a person's personal property, "no procedural due process violation has occurred if a meaningful postdeprivation remedy for the loss is available."  <u>Case v. Eslinger</u>, 555 F.3d 1317, 1331 (11th Cir. 2009) (quoting <u>Lindsey v. Storey</u>, 936 F.2d 554, 561 (11th Cir. 1991)).  "[T]he state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy."  <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984).

Georgia law provides a postdeprivation remedy through an action for conversion of personal property, which "is a sufficient postdeprivation remedy when it extends to unauthorized seizures of personal property by state officers."  <u>Case</u>, 555 F.3d at 1331.  This claim arises under O.C.G.A. § 51-10-1.  <u>Lindsey</u>, 936 F.2d at 561.  This statute provides that "[t]he owner of personalty is entitled to its possession," and "[a]ny deprivation of such possession is a tort for

which an action lies." O.C.G.A. § 51-10-1. The Eleventh Circuit has noted that, "[t]his statutory provision covers the unauthorized seizure of personal property by police officers. Therefore, the state has provided an adequate postdeprivation remedy when a plaintiff claims that the state has retained his property without due process of law." Lindsey, 936 F.2d at 561 (quoting Byrd v. Stewart, 811 F.2d 554, 555 n.1 (11th Cir. 1987) (per curiam)); see also Allen v. Peal, No. CV 312-007, 2012 WL 2872638, at *2–3 (S.D. Ga. June 18, 2012) (dismissing a due process claim for lost or seized personal property because O.C.G.A. § 51-10-1 provides an adequate post-deprivation remedy). Because Georgia provides a remedy in tort law for Plaintiff's converted property, he cannot successfully state a Section 1983 constitutional claim.

Consequently, Plaintiff's claims regarding the alleged confiscation and deprivation of his property comprise a matter for determination by state law. Therefore, Plaintiff may not present his claims to this Court under Section 1983. Thus, the Court should **DISMISS** Plaintiff's due process claims as to his lost personal property.[7]

## V.     Dismissal of AIRFA Claims

Throughout his Complaint, Plaintiff alleges various actions of Defendants, such as denying him access to kinnikinnick and interfering with his weekly prayer services, violated his rights under AIRFA. (Doc. 1, pp. 6–9, 11–13.) However, AIRFA, which enshrines a national policy of preserving Native American religious practices, does not grant a separate cause of action. See 42 U.S.C. § 1996.

Under AIRFA, the policy of the United States is "to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions

---

[7] It does not appear from Plaintiff's Complaint that he seeks to assert a state law claim, under O.C.G.A. § 51-10-1, or any other authority, for the deprivation of his property in this Court. If Plaintiff were to assert such a state law claim, it is possible that this Court could exercise supplemental jurisdiction over the claim. See 28 U.S.C. § 1367. Should Plaintiff seek to bring such a state law claim, he must move to amend his Complaint to assert such a claim, within **fourteen days** of the date of this Order.

of the American Indian . . . including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." Id. In Lyng v. Northwest Indian Cemetery Protective Association, the Supreme Court made clear that this statutory policy falls short of creating a cause of action. 485 U.S. 439, 455 (1988). "Nowhere in the law is there so much as a hint of any intent to create a cause of action or any judicially enforceable individual rights." Id. (noting AIRFA "has no teeth in it" (quoting 124 Cong. Rec. 21444(1978))). Accordingly, because Plaintiff has no enforceable rights or cause of action under AIRFA, the Court should **DISMISS** his AIRFA religious discrimination claims against all Defendants.

## VI.    RLUIPA Claims

Plaintiff asserts Defendants Smith, Allen, Bobbit, and Hutchinson violated his rights under RLUIPA to practice his Native American religion by depriving him of kinnikinnick and other sacred items, precluding him from prayer ceremonies, and retaliating against him through confinement in Tier II because of his religious beliefs. (Doc. 1, pp. 6–9, 11–13.) RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of [Title 42], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> > (1) is in furtherance of a compelling government interest; and
> >
> > (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a). A plaintiff bears "the initial burden of proving" a policy or action "implicates his religious exercise." Holt v. Hobbs, 574 U.S. ___, 135 S. Ct. 853, 862 (2015). The RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a

system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). A plaintiff also has the burden of establishing the policy or action "substantially burden[s an] exercise of religion." <u>Holt</u>, at ___, 135 S. Ct. at 862.

Without question, Plaintiff has plausibly alleged that Defendants Smith, Allen, Bobbit, and Hutchinson have implemented a policy and engaged in conduct that implicate and substantially burden his exercise of religion. According to Plaintiff, he has been denied the ability to pray and consume kinnikinnick consistent with his religious beliefs. Moreover, Plaintiff states that Defendants placed him in Tier II segregation, where he is subjected to strenuous rules that burden the practice of his Native American religion, in retaliation for his religious beliefs and practices. Tellingly, Plaintiff asserts he smoked kinnikinnick at weekly prayer services for years with the blessing, and under the supervision of, prison officials, but this policy of accommodation was ended because, according to Defendant Smith, other inmates wanted to observe Native American religious traditions. (Doc. 1, p. 7.) The Court must accept such assertions as true in conducting a frivolity review. Thus, Plaintiff arguably sets forth a plausible cause of action pursuant to RLUIPA against Defendants Smith, Allen, Bobbit, and Hutchinson for each of their role in burdening Plaintiff's religious exercise.

However, Plaintiff is limited to seeking injunctive relief and nominal damages under RLUIPA. While RLUIPA creates "a private cause of action for a prison inmate if [S]ection 3 is violated, and further provides that the complaining party, if successful, may 'obtain appropriate relief against a government,'" a prisoner is still subject to the terms of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, which precludes the recovery of monetary damages absent a showing of physical injury. <u>Smith v. Allen</u>, 502 F.3d 1255, 1269 (quoting 42 U.S.C. § 2000cc–2(a)), *abrogated on other grounds by* <u>Sossamon v. Texas</u>, 563 U.S. 277 (2011).

Moreover, the Eleventh Circuit has held that Section 3 of RLUIPA (42 U.S.C. § 2000cc-1) "cannot be construed as creating a private action against individual defendants for monetary damages," Smith, 502 F.3d at 1275, and the Supreme Court has held that RLUIPA does not validly waive a State's sovereign immunity against monetary damages, Sossamon, 563 U.S. 277, 286–87.

For these reasons, the Court should **DISMISS** Plaintiff's compensatory and punitive damages claims brought pursuant to RLUIPA. However, Plaintiff's request for nominal damages and injunctive relief under RLUIPA survives frivolity review.

## VII. First Amendment Claims

### A. Free Exercise Clause Claims

Plaintiff asserts Defendants Smith, Allen, Bobbit, and Hutchinson violated his First Amendment rights to the free exercise of his Native American religion through the conduct described above. (Doc. 1, pp. 6–9, 11–13.) The Free Exercise Clause of the First Amendment "requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). "To establish a violation of his right to free exercise," a plaintiff "must first establish that a state actor imposed a 'substantial burden' on his practice of religion." Wilkinson v. GEO Grp., Inc., No. 14-10215, 2015 WL 1526642, at *2 (11th Cir. Apr. 7, 2015) (citing Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 2 F.3d 1514, 1549 (11th Cir. 1993)). To prove that his religious exercise was substantially burdened, a plaintiff "must present evidence that he was coerced to perform conduct that his religion forbids or prevented from performing conduct that his religion requires." Id. The defendants can then support their conduct on the ground that they applied a

"neutral law of general applicability." Emp't Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 879 (1990).

Prisoners retain their First Amendment rights, including rights under the free exercise of religion clause. However, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Brunskill v. Boyd, 141 F. App'x 771, 774 (11th Cir. 2005) (per curiam) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)). "In the prison context, the state actor can defend the action if it is 'reasonably related to legitimate penological interests.'" Wilkinson, 2015 WL 1526642, at *2 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Put succinctly, "[i]n a prison setting, to demonstrate a free exercise violation, a plaintiff must show that prison officials administered or implemented a policy or regulation, not reasonably related to any legitimate penological interest or security measure, which substantially burdens and significantly interferes with the practice of his religion or restricts his free exercise of a sincerely held religious belief." Hosey-Bey v. Williams, No. 2:12-CV-959-WHA, 2015 WL 4988388, at *6 (M.D. Ala. Aug. 19, 2015) (citations omitted).

Plaintiff alleges that Defendants Smith, Allen, Bobbit, and Hutchinson prohibited Plaintiff from smoking kinninnick in conjunction with his weekly Native American prayer ceremonies, confiscated previously approved sacred items, and interfered with his prayer practices. The Court finds these allegations sufficient to set forth plausible free exercise claims. Therefore, Plaintiff's free exercise claims survive frivolity review and will proceed.

### B.  Establishment Clause Claims

Plaintiff asserts Defendants Allen, Bobbit, and Hutchinson violated his right to be free from government established religion when they mandated Plaintiff only be allowed to possess a

Bible or Koran while in Tier II and confiscated Plaintiff's Native American religious books. (Doc. 1, pp. 11–12.)  The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  This restriction has been applied to the States and individual governmental actors through the Due Process Clause of the Fourteenth Amendment.  <u>Lee v. Weisman</u>, 505 U.S. 577, 580, 587 (1992); <u>Everson v. Board of Ed. of Ewing</u>, 330 U.S. 1, 14–15 (1947); <u>Holloman v. Harland</u>, 370 F.3d 1252, 1284 (11th Cir 2004) (citations omitted).

The permissibility of a government mandated rule or practice that implicates the Establishment Clause is assessed under a three-pronged analysis: (1) the rule "must have a secular . . . purpose;" (2) its "principal or primary effect must be one that neither advances nor inhibits religion;" and (3) it "must not foster excessive government entanglement with religion." <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612–13 (1971); <u>see also</u> <u>Smith v. Governor of Alabama</u>, 562 F. App'x 806, 816 (11th Cir. 2014) (per curiam) (applying the <u>Lemon</u> test to a prison faith-based dormitory program).  More recently, the Supreme Court has instructed courts to pay particularly close attention to whether the challenged governmental practice has either "the purpose or effect of 'endorsing' religion."  <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 592 (1989) (citation omitted); <u>see also</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 233 (1997) (folding the 'excessive entanglement' analysis into the 'primary effect' analysis).

Plaintiff's allegation that Defendants Allen, Bobbit, and Hutchinson violated the Establishment Clause by mandating certain Tier II confined prisoners only be allowed access to the Bible or Koran and by banning Native American and other religious books states a plausible constitutional claim.  Indeed, Plaintiff asserts these Defendants *only* allow him access to the Bible or Koran; no other books or reading materials are permitted whatsoever, secular or

otherwise. (Doc. 1, pp. 11–12.) The "primary effect" of such a rule, it could be argued, is to both inhibit Native American religions and to advance the Christian and Islamic religions. Accordingly, at this stage of the litigation, the Court finds Plaintiff's allegations set forth plausible Establishment Clause claims. These claims survive frivolity review and shall proceed.

### C.  Retaliation Claims

Because Plaintiff asserts three distinct forms of retaliation, one of which borders on what forms of retaliation are cognizable under the Constitution and Eleventh Circuit precedent, the Court addresses each of them separately.

### (1)  Grievance Filing & Litigation

"It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." O'Bryant v. Finch, 637 F.3d 1207, 1212 (11th Cir. 2011). It is also established that an inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints. Id. (quoting Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008) (citation and punctuation omitted)). "To establish a First Amendment retaliation claim, a prisoner need not allege the violation of an additional separate and distinct constitutional right; instead, the core of the claim is that the prisoner is being retaliated against for exercising his right to free speech." O'Bryant, 637 F.3d at 1212. "To prevail, the inmate must establish these elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected

speech." Smith, 532 F.3d at 1276 (citing Bennett v. Hendrix, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)).

Plaintiff alleges that, because he filed grievances and the instant litigation, Defendants Smith, Allen, Bobbit, Hutchinson, Shoemake, and Piniero retaliated against him by placing and holding him in Tier II segregation without due process, interfering with his religious practices, and denying him access to a paralegal course. (Doc. 1, pp. 6–7, 11–12; Doc. 12, pp. 2–5, 7–10.) These allegations give rise to a plausible retaliation claim. Plaintiff engaged in protected speech, the filing of grievances and his Complaint, and suffered adverse action of severely restricted confinement in Tier II and harassment of his Native American religious practices. At this stage of the litigation, Plaintiff's allegations sufficiently show a causal link and thus state a plausible retaliation claim. Accordingly, these claims shall proceed.

### (2)    Religious Retaliation

Plaintiff alleges that, because he practiced a Native American religion and engaged in ceremonial use of kinnikinnick, Defendants Smith, Allen, Bobbit, Hutchinson, and Shoemake retaliated against him by denying him an opportunity to pray, confiscating his sacred religious items, and holding him in Tier II confinement on false disciplinary reports without due process. (Doc. 1, pp. 6–7, 11–12; Doc. 12, pp. 2–5.) Thus, Plaintiff engaged in protected speech, the exercise of his religion, and suffered adverse action as a result.[8] As to a causal link, for example, Defendant Allen reportedly singled out Plaintiff because of his religious beliefs, saying "where is my damn Indian at," when he and Defendants Hutchinson and Shoemake wrongly assigned Plaintiff to Phase 1 of Tier II confinement. (Doc 12, pp. 2–5.) Taken together, Plaintiff's

---

[8] Like grievance filing, religious exercise is a form of speech protected by the First Amendment. See Adams v. Davenport, No. 2:06-CV-959-WKW, 2012 WL 5497971, at *5 (M.D. Ala. Oct. 5, 2012) (analyzing an alleged First Amendment religious retaliation claim), *report and recommendation adopted by* 2012 WL 5497966 (M.D. Ala. Nov. 13, 2012)

allegations therefore state plausible religious retaliation claims against Defendants Smith, Allen, Bobbit, Hutchinson, and Shoemake. Accordingly, Plaintiff's claims survive frivolity review and shall proceed.

### 3. Equal Protection Retaliation[9]

Liberally construing Plaintiff's allegations, he also attempts to state equal protection based retaliation claims against Defendants Smith, Allen, Hutchinson, and Shoemake. (Doc. 1, pp. 6–7; Doc. 12, pp. 2–5.) These claims largely arise under the same facts as Plaintiff's other retaliation claims but do not state plausible claims because Eleventh Circuit precedent squarely forecloses retaliation claims arising under the Equal Protection Clause of the Fourteenth Amendment. In Ratliff v. DeKalb County, the Eleventh Circuit found that a constitutional retaliation claim asserted under Section 1983 may be brought "pursuant to the [F]irst [A]mendment, not the [E]qual [P]rotection [C]lause." 62 F.3d 338, 341 (11th Cir. 1995) (also granting qualified immunity because no established right exists under the Equal Protection Clause to not be retaliated against). Accordingly, the Court should **DISMISS** Plaintiff's equal protection based retaliation claims against Defendants Smith, Allen, Hutchinson, and Shoemake.

## VIII. Fourteenth Amendment Claims

### A. Equal Protection Clause Claims

The Equal Protection Clause of the Fourteenth Amendment provides that persons similarly situated should be treated alike. See, e.g., City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the [government] engaged in invidious discrimination against him based on race, religion,

---

[9] Although an Equal Protection Clause based retaliation claim arises under the Fourteenth Amendment, the Court address Plaintiff's particular claims here for ease of organization and because it is due to be dismissed under controlling Eleventh Circuit precedent.

national origin, or some other constitutionally protected basis." <u>Sweet v. Sec'y, Dep't of Corr.</u>, 467 F.3d 1311, 1318–19 (11th Cir. 2006) (citation omitted). The equal protection clause prohibits only intentional discrimination. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009). Thus, a plaintiff must demonstrate that each defendant acted with or was motivated by a discriminatory intent or purpose. <u>Parks v. City of Warner Robins</u>, 43 F.3d 609, 616 (11th Cir. 1995).

According to Plaintiff, Defendants Smith, Allen, Hutchinson, Bobbit, Shoemake, and Pineiro discriminatorily confined Plaintiff in Tier II segregation, denied him the right to practice his Native American religion, and prohibited him from taking a paralegal course. (Docs. 1, 12.) As a threshold matter, broadly speaking, Plaintiff's factual allegations show that he practices a Native American religion and has been allegedly subjected to discrimination due to his religious beliefs and practices. Liberally construing Plaintiff's allegations, he states sufficient facts to establish a plausible claim that these Defendants intentionally discriminated against him on the basis of religion. As compared to inmates who do not follow a Native American religion, Plaintiff states or implies that: Defendants Smith, Hutchinson, and Bobbit denied him the same opportunity to pray with religious items, (doc.1, pp. 6, 12–13); Defendants Allen, Hutchinson, and Shoemake confined Plaintiff in Tier II segregation without the same due process, (<u>id.</u> at pp. 9–11; doc 12, pp. 2–5); Defendants Hutchinson, Allen, and Bobbit precluded Plaintiff from possessing the same religiously significant texts, (doc. 1, pp. 11–12); and Defendants Allen, Pineiro, and Hutchinson prohibited Plaintiff from taking the same paralegal course, (doc. 12, pp. 7–10).

In sum, Plaintiff alleges that he has been treated differently in various manners by Defendants Smith, Allen, Hutchinson, Bobbit, Shoemake, and Pineiro due to his Native

American religious beliefs. Accordingly, Plaintiff's equal protection claims survive frivolity review. See Jones v. St. Lawrence, No. CV410-066, 2010 WL 2772440, at *2 (S.D. Ga. July 13, 2010) ("Jones alleges that Muslims have been treated differently from Christian and Jewish inmates . . . . That is all that is required to survive § 1915A screening here."). However, Plaintiff is forewarned that to successfully maintain these claims he will have to show each Defendant acted with discriminatory animus and that similarly situated inmates received more favorable treatment (i.e. Plaintiff must distinguish between his equal protection claims as a Tier II inmate and those that arose while in general population, and he must show non-Native American religious inmates with a similar incarceration status or security classification were more favorably treated).

### B. Due Process Clause Violations

#### 1. Procedural Due Process

Plaintiff argues that he has been confined in disciplinary segregation without due process of law. A Section 1983 action alleging a procedural due process violation requires proof of three elements: "deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally-inadequate process." Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994). The Eleventh Circuit Court of Appeals has identified two situations in which a prisoner—already deprived of liberty in the traditional sense—can be further deprived of liberty such that procedural due process protections are required: (1) when there is a "change in the prisoner's conditions of confinement so severe that it essentially exceeds the sentence imposed by the court"; and (2) when the State has consistently given a benefit to prisoners, usually through a statute or administrative policy, and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Kirby

v. Siegelman, 195 F.3d 1285, 1291 (11th Cir. 1999) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

Plaintiff alleges that Defendants Allen, Hutchinson, and Shoemake confined Plaintiff in Tier II segregation without the due process guaranteed to him by Georgia State Prison's SOP. (Doc. 1, pp. 9–11; Doc. 12, pp. 2–5.)  Plaintiff argues he was confined to Tier II without a proper hearing and based on false disciplinary reports, even though he had a clean performance sheet. Furthermore, while assigned to Tier II segregation, Plaintiff's ability to exercise his Native American religion has been severely limited and he has been subjected to strict prohibitions, including no personal property, no access to any media or reading materials except for the Bible or Koran, little to no human contact or yard time, and insufficient access to mental health treatment, among other restrictions.  (Id.)

At this stage of the litigation, Plaintiff's allegations of severely restricted confinement could plausibly establish his placement in the Tier II unit was punitive in nature and that the conditions in Tier II imposed an atypical and significant hardship.  Additionally, Plaintiff's allegations plausibly establish his Tier II status was occasioned in contravention of Georgia State Prison's SOP, without any due process of law.  Accordingly, Plaintiff arguably states a cognizable procedural due process claim against Defendants Allen, Hutchinson, and Shoemake, and those claims will proceed.

### 2.  Substantive Due Process

The substantive component of the Due Process Clause "provides heightened protection against government interference with certain fundamental rights."  Washington v. Glucksberg, 521 U.S. 702, 718–19 (1997) (citations omitted).  If Plaintiff has a fundamental right, then the government may not infringe on that right unless it proves that the limitation is "narrowly

tailored to serve a compelling state interest." <u>Reno v. Flores</u>, 507 U.S. 292, 302 (1993). To establish a substantive due process right beyond those already recognized by precedent, a claimant must show that the asserted fundamental liberty interest is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [the interest] was sacrificed." <u>Kerry v. Din</u>, 576 U.S. ___, ___, 135 S. Ct. 2128, 2134 (2015) (quoting <u>Glucksberg</u>, 521 U.S. at 720–21).

Here, Plaintiff ostensibly claims that he has a fundamental right to not be administratively segregated from the prison's general population.[10] This right is not already enumerated within the Supreme Court's "substantive-due-process line of cases." <u>Id.</u> at ___, 135 S. Ct. at 2135. Moreover, the Supreme Court's decisions "have consistently refused to recognize more than the most basic liberty interests in prisoners." <u>Hewitt v. Helms</u>, 459 U.S. 460, 467 (1983). These basic interests do not include freedom from more adverse conditions of confinement. <u>Meachum v. Fano</u>, 427 U.S. 215, 224–25 (1976). Thus, there is no "objectively, deeply rooted" history and practice in this Nation to be free from administrative segregation or even a segregation with more adverse conditions, and thus, no fundamental liberty right.

Accordingly, Plaintiff fails to state a cognizable substantive due process claim, and the Court should **DISMISS** Plaintiff's substantive due process claims against all Defendants.

## IX.    42 U.S.C. §§ 1983, 1985, & 1986 Conspiracy Claims

Plaintiff claims Defendants Smith and Allen conspired to deny his religious rights arising under the First Amendment, RLUIPA, and AIRFA, and conspired to deny his Fourteenth

---

[10] To be sure, Plaintiff also asserts Defendants violated his religious and due process rights as well as his right to be free from cruel and unusual punishment, but violations of these specific rights do not implicate substantive due process and cannot form the basis of a Fourteenth Amendment claim. <u>See</u> <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular government behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims.") (citation and internal quotation marks omitted).

Amendment equal protection and due process rights. (Doc. 1, pp. 8–9.) Plaintiff alleges Defendant Smith relayed to Plaintiff that he contacted Defendant Allen about Plaintiff's use of kinnikinnick, and Defendant Allen admitted to speaking with Defendant Smith prior to Plaintiff's arrival to Georgia State Prison about Plaintiff's religious practices with kinnikinnick. (Id.) "To establish a prima facie case of [a S]ection 1983 conspiracy, a plaintiff must show, among other things, that defendants 'reached an understanding to violate [his] rights.'" Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283 (11th Cir. 2007) (quoting Strength v. Hubert, 854 F.2d 421, 425 (11th Cir. 1988)). A "plaintiff does not have to produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy, . . . but must show some evidence of agreement between the defendants." Id. at 1283–84 (quoting Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990)). "[T]he linchpin for conspiracy is agreement." Bailey v. Bd. of Cty. Comm'rs, 956 F.2d 1112, 1122 (11th Cir. 1992). "[M]erely string[ing] together" alleged acts of individuals is not sufficient to establish the existence of a conspiracy. Harvey v. Harvey, 949 F.2d 1127, 1133 (11th Cir. 1992).

Likewise, "[t]o state a claim under [42 U.S.C.] § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) resulting in an injury to person or property, or a deprivation of any right or privilege of a citizen of the United States." Gibbs v. United States, 517 F. App'x 664, 669 (11th Cir. 2013) (per curiam) (citing Childree v. UAP/GA AG Chem., Inc., 92 F.3d 1140, 1146–47 (11th Cir. 1996)). "The language of Section 1985 which requires an intent to deprive one of equal protection or equal privileges and immunities means that there must be some racial or otherwise class-based invidiously discriminatory animus behind the conspirators' action." Byrd

v. Clark, 783 F.2d 1002, 1007–08 (11th Cir. 1986), *abrogated on other grounds by* Nolin v. Isbell, 207 F.3d 1253, 1256 (11th Cir. 2000).

Section 1986, by contrast, creates a cause of action against any person who has knowledge of a conspiracy to interfere with civil rights and has the power to prevent the commission of such wrongs but neglects to do so. 42 U.S.C. § 1986. In other words, where Section 1985 provides a cause of action directly against the conspirators, Section 1986 provides a cause of action against persons who fail to stop the conspiracy made unlawful by Section 1985. See White v. Berger, 709 F. App'x 532, 538–39 (11th Cir. 2017) (per curiam) (noting that "Section 1986 claims are derivative of claims raised under [Section] 1985").

At this stage of litigation, accepting Plaintiff's facts as true and construing them in his favor, Plaintiff states a plausible conspiracy claim against Defendants Smith and Allen. Plaintiff's factual allegations show that Defendants Smith and Allen agreed by phone conversation to deny Plaintiff's religious exercise rights secured by the First Amendment and RLUIPA and that Defendant Allen furthered the conspiracy by prohibiting Plaintiff's ceremonial, religious use of kinnikinnick during prayer. (Doc. 1, pp. 8–9.) Furthermore, Plaintiff's allegations, taken as a whole, could arguably show these Defendants acted with discriminatory animus against Plaintiff's Native American religion.

Plaintiff, however, does not allege that any official failed to prevent Defendants Smith and Allen's conspiracy to deny Plaintiff's religious rights. Plaintiff's conspiracy allegations are limited to the conspirators themselves. Indeed, Plaintiff fails to point to any official who knew of the conspiracy but did nothing to prevent it, much less a prison official with authority superior to Defendant Allen's authority as warden. Accordingly, although Plaintiff arguably states plausible Section 1983 and 1985 conspiracy claims against Defendants Smith and Allen, he fails

to state a claim against anyone under Section 1986, and thus the Court should **DISMISS** Plaintiff's Section 1986 claims.

## IX.     Dismissal of Claims for Compensatory and Punitive Damages

Although Plaintiff sets forth several colorable First and Fourteenth Amendment violations, like Plaintiff's RLUIPA claims, Eleventh Circuit precedent precludes recovery of compensatory and punitive damages for successful constitutional claims absent a showing of physical injury.   Section 1997e(e) of the PLRA bars prisoner civil actions for "mental or emotional injury suffered while in custody without a prior showing of physical injury."   The Eleventh Circuit has broadly construed this provision to foreclose recovery of any monetary damages for claims that do not involve a physical injury, even constitutional claims that generally, by their very nature, do not result in physical harm.   Harris v. Garner, 216 F.3d 970, 984–85 (11th Cir. 2000) (en banc).[11]   Despite this broad limitation, successful constitutional claimants who lack a physical injury may still recover nominal damages.   Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages.").   Further, the Eleventh Circuit has instructed Courts to dismiss an inmate's compensatory and punitive damages claims under Section 1997e(e) without prejudice to allow an inmate to refile when and if he is released.   Harris, 216 F.3d at 980.

---

[11]   Contra Aref v. Lynch, 833 F.3d 242, 262–264 (D.C. Cir. 2016) (discussing the circuit split over 1997e(e)'s ambit and concluding that "[a]nalogous Supreme Court and circuit precedent supports the view that there can be real [compensable] harms separate and apart from mental or emotional injury" for constitutional claims not resulting in physical injury; also noting "we find it hard to believe that Congress intended to afford virtual immunity to prison officials even when they commit blatant constitutional violations, as long as no physical blow is dealt"); see also Eleanor M. Levine, Compensatory Damages Are Not for Everyone: Section 1997e(e) of the Prison Litigation Reform Act and the Overlooked Amendment, 92 Notre Dame L. Rev. 2203, 2211–14 (2017) (The Second, Third, Eighth, Tenth, and Eleventh Circuits employ the "more restrictive approach," while the Sixth, Seventh, Ninth, and District of Columbia Circuits employ the "less restrictive approach.").

Consequently, because Plaintiff did not plead that he suffered an actual physical injury resulting from Defendants' alleged First and Fourteenth Amendment violations, the Court should **DISMISS without prejudice** Plaintiff's First and Fourteenth Amendment claims for compensatory and punitive damages. Further, because Plaintiff's predicate constitutional claims for damages are due to be dismissed, the Court should also **DISMISS without prejudice** Plaintiff's conspiracy claims for compensatory and punitive damages.

## XI.    Eighth Amendment Claims

### A.    Conditions of Confinement Claims

Plaintiff alleges that his conditions of confinement on Tier II segregation violate the Eighth Amendment's proscription against cruel and unusual punishment. (Doc. 1, pp. 9–11; Doc. 12, pp. 2–5.) The cruel and unusual punishment standard of the Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Generally speaking, however, "prison conditions rise to the level of an Eighth Amendment violation only when they involve the wanton and unnecessary infliction of pain." Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal quotation marks omitted). Thus, not all deficiencies and inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights. Rhodes v. Chapman, 452 U.S. 337, 349 (1981). The Constitution does not mandate comfortable prisons. Id. Prison conditions violate the Eighth Amendment only when the prisoner is deprived of "the minimal civilized measure of life's necessities." Id. at 347. In evaluating conditions of confinement claims, courts look to both the degree of "food, clothing, sanitation, medical care, and personal safety" afforded to the inmate and the "length of time in isolation." Sheley v. Dugger, 833 F.2d 1420, 1428–29 (11th Cir. 1987) (per curiam).

Even accepting Plaintiff's assertions that Defendants Allen, Hutchinson, and Shoemake discriminatorily placed him in Tier II confinement without owed due process, where conditions are significantly more restrictive than the general prison population, Plaintiff fails to plausibly state an Eighth Amendment claim. The conditions imposed in "administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment." Sheley, 833 F.2d at 1428–29; see also Gholston v. Humphrey, No. 5:12-CV-97-MTT-MSH, 2014 WL 4976248, at *3 (M.D. Ga. Oct. 3, 2014) (dismissing prisoner's claims that his transfer to unit with more restrictive conditions without a "legitimate penological justification" amounts to an Eighth Amendment violation); Anthony v. Brown, No. CV 113-058, 2013 WL 3778360, at *2 (S.D. Ga. July 17, 2013) (dismissing on frivolity review Eighth Amendment claims based on conditions of confinement in crisis stabilization unit). As detailed above, an Eighth Amendment violation requires the prisoner to allege that he is deprived of "the minimal civilized measure of life's necessities," Rhodes, 452 U.S. at 349, and here Plaintiff's complaints of being on some degree of Tier II confinement since January 2017, where he is not allowed to personally flush his toilet, has little human contact or yard time, and has no access to any media other than a Bible or Koran, (doc. 1, pp. 10–11), fall below the cruel and unusual punishment standard.

These allegations, without more, cannot state an Eighth Amendment conditions-of-confinement claim. Cf. Quintanilla v. Bryson, No. 17-14141, 2018 WL 1640140, at *6–7 (11th Cir. Apr. 5, 2018) (per curiam) (concluding that a more than one-year stay in administrative segregation, where the prisoner lived in a vermin and insect infested cell, lacked basic elements of hygiene, was systematically starved, and rarely had human contact or yard time, stated a claim); Sheley, 833 F.2d at 1428–30 (finding that a *twelve-year* confinement in administrative segregation could state an Eighth Amendment claim, even where adequate food, clothing, and

sanitation are provided, due to the "long period of segregation"). In this case, Plaintiff has not alleged a Tier II confinement nearly as long as in <u>Sheley</u> or nearly as drastic as in <u>Quintanilla</u>. Indeed, although Plaintiff complains he cannot personally flush his toilet and has little human contact, he states guards come by every three or four hours to tend to his toilet. Likewise, Plaintiff states he does get a "little" yard time, even though he is usually confined to his cell for twenty-four hours each day, and importantly, he does not complain of inadequate food or a breakdown of his personal hygiene or his cell's sanitation. (Doc. 1, pp. 10–11.)

Accordingly, the Court should **DISMISS** Plaintiff's Eighth Amendment conditions of confinement claims based upon his placement in Tier II confinement for failure to state a claim.

### B.     Deliberate Indifference to Serious Medical Needs

Plaintiff argues Defendants Allen, Pineiro, Reno, Gillis, and DeGroot are deliberately indifferent to his serious mental health needs and that these Defendants maintain a custom or policy of constitutionally inadequate mental health services. (Doc. 12, pp. 5–7.) A deliberate indifference to serious medical needs claim requires analysis of the Eighth Amendment proscription against cruel and unusual punishment. That proscription imposes a constitutional duty upon prison officials to ensure that inmates receive adequate medical care. <u>Farmer</u>, 511 U.S. at 832.

The Eighth Amendment standard in the medical care context, embodied by the principles expressed in <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate. <u>Farmer</u>, 511 U.S. at 828. However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting <u>Estelle</u>, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

Thus, in order to prove a deliberate indifference to medical care claim, a prisoner must: (1) "satisfy the objective component by showing that [he] had a serious medical need"; (2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and (3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). As to the first component, a medical need is serious if it "'has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill, 40 F.3d at 1187). Under the second, subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Thus, the subjective component requires an inmate to prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Melton v. Abston, 841 F.3d 1207, 1223 (11th Cir. 2016).[12]

"Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). Additionally, a defendant who "delays necessary treatment for non-medical reasons"

---

[12] Eleventh Circuit case law on whether a claim of deliberate indifference requires "more than *gross* negligence" or "more than *mere* negligence" is inconsistent. Compare Goebert, 510 F.3d at 1327, with Bingham, 654 F.3d at 1176. In Melton, the Eleventh Circuit directly addressed this discrepancy and found "more than mere negligence" to be the appropriate standard. 841 F.3d at 1223 n.2. Accordingly, this Court will apply the "more than mere negligence" standard.

or "knowingly interfere[s] with a physician's prescribed course of treatment" may exhibit deliberate indifference.  Id. (citations omitted).

In instances where a deliberate indifference claim turns on a delay in treatment rather than the type of medical care received, the Court considers "the reason for the delay and the nature of the medical need."  Farrow v. West, 320 F.3d 1235, 1246 (11th Cir. 2003) (citing McElligott, 182 F.3d at 1255).  When a claim turns on the quality of treatment provided, however, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference."  Melton, 841 F.3d at 1224 (quoting Harris, 941 F.2d at 1505).  In other words, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Furthermore, deliberate indifference is not established when an inmate receives medical care, but "may have desired different modes of treatment."  Hamm v. Dekalb County, 774 F.2d 1567, 1575 (11th Cir. 1985).

Plaintiff, who has been diagnosed with several mental illnesses, alleges that Defendants Allen, Pineiro, Reno, Gillis, and DeGroot have failed to provide Plaintiff with adequate mental health care while he has been confined at Georgia State Prison since January 2017.  (Doc. 12, pp. 5–7.)  Specifically, Plaintiff claims he has never seen a psychologist, in contravention of the SOP, has not seen a consistent mental health counselor, has never been given individual counseling, has been denied medication, and has generally "not received any kind of treatment" other than Christian coping methods and crossword puzzles.  Plaintiff argues this lack of care caused him to cut his wrists and to attempt suicide.  As to each Defendant's role, Plaintiff alleges Defendants Allen and Pineiro are aware of the inadequate mental health care being provided because inmates, seemingly Plaintiff included, have frequently complained about it and several

have committed suicide as a result; Plaintiff alleges Defendant Reno also knows of the inadequate care because she is the director of mental health; finally, Plaintiff alleges Defendants Gillis and DeGroot, as his assigned counselor and doctor respectively, each personally participated in his deliberately indifferent mental health care. (Id.)

At this early stage of litigation, Plaintiff's allegations against Defendants Allen and Pineiro are sufficient to state a claim for deliberate indifference to serious medical needs. Plaintiff states that he is a known mental health inmate with diagnosed mental health illnesses who has received what amounts to essentially no treatment at all, and these Defendants know about the deficient mental health care problem at Georgia State Prison because they have been notified by inmates about it. Plaintiff also claims that these Defendants maintain a custom or policy of an inadequately staffed and trained mental health department and states that there is a widespread history of harm arising from deficient mental health care. As such, Plaintiff has alleged enough facts at frivolity review to plausibly show Defendants Allen and Pineiro are liable for deliberate indifference to Plaintiff's serious medical needs beyond their supervisory status or theory of *respondeat superior*. See Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam) (citation omitted) (supervisory officials not subject to vicarious liability, but can be held liable due to, *inter alia*, the existence of a custom or policy resulting in deliberate indifference or a history of widespread abuse sufficient to confer notice).

Based on these allegations, Plaintiff has stated a plausible claim of deliberate indifference to medical needs against Defendants Allen and Pineiro. Accordingly, these claims survive frivolity review and shall proceed.

## XII. Leave to Appeal *in Forma Pauperis*

The Court should also deny Plaintiff leave to appeal *in forma pauperis*.[13] Though Plaintiff has, of course, not yet filed a notice of appeal, it would be appropriate to address these issues in the Court's order of dismissal. Fed. R. App. P. 24(a)(3) (trial court may certify that appeal is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3). Good faith in this context must be judged by an objective standard. Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999). A party does not proceed in good faith when he seeks to advance a frivolous claim or argument. See Coppedge v. United States, 369 U.S. 438, 445 (1962). A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless. Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993). An *in forma pauperis* action is frivolous, and thus not brought in good faith, if it is "without arguable merit either in law or fact." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002); see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at *1–2 (S.D. Ga. Feb. 9, 2009).

Based on the above analysis of Plaintiff's claims against Defendants Reno, Gillis, and DeGroot, there are no non-frivolous issues to raise on appeal, and an appeal would not be taken in good faith. Thus, the Court should **DENY** Plaintiff *in forma pauperis* status on appeal as to these Defendants.

## CONCLUSION

For the reasons and in the manner set forth above, I find Plaintiff plausibly states colorable: RLUIPA claims; First Amendment free exercise, establishment clause, and retaliation

---

[13] A certificate of appealability is not required in this Section 1983 action.

claims; Fourteenth Amendment equal protection and due process claims; Section 1983 and 1985 conspiracy claims; and Eighth Amendment deliberate indifference to serious medical needs claims.

However, I **RECOMMEND** the Court **DENY** Plaintiff's requests for Preliminary Injunctions and his Motion for Law Library Access, (docs. 1, 9, 12), **DISMISS as moot** Plaintiff's Motion for an Update on Complaint, (doc. 13), and **DISMISS** Plaintiff's: official capacity damages claims; personal property loss claims; RLUIPA compensatory and punitive damages claims; American Indian Religious Freedom Act ("AIRFA") claims, 42 U.S.C. § 1986 conspiracy claims; First Amendment access-to-courts claims; Fourteenth Amendment retaliation claims; and Eighth Amendment conditions of confinement claims. Further, I **RECOMMEND** the Court **DISMISS without prejudice** Plaintiff's First Amendment, Fourteenth Amendment and conspiracy claims for compensatory and punitive damages, and all claims against Defendants Reno, Gillis, and DeGroot. Additionally, the Court should **DENY** Plaintiff leave to appeal *in forma pauperis* as to his claims against Defendants Reno, Gillis, and DeGroot.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within fourteen (14) days of the date on which this Report and Recommendation is entered. Any objections asserting that the Magistrate Judge failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed

findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the Magistrate Judge. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. A party may not appeal a Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a District Judge. The Court **DIRECTS** the Clerk of Court to serve a copy of this Report and Recommendation upon the parties.

## DEFENDANTS AND REMAINING CLAIMS

Plaintiff's allegations in his Complaint arguably state at least one colorable claim for relief against all Defendants named in his cause of action. Consequently, a copy of Plaintiff's Complaint and a copy of this Order shall be served upon Defendants Smith, Allen, Bobbit, Hutchinson, Pineiro, and Shoemake by the United States Marshal without prepayment of cost. The Court also provides the following instructions to the parties that will apply to the remainder of this action and which the Court urges the parties to read and follow.

## <u>INSTRUCTIONS TO DEFENDANTS</u>

Because Plaintiff is proceeding *in forma pauperis*, the undersigned directs that service be effected by the United States Marshal. Fed. R. Civ. P. 4(c)(3). In most cases, the marshal will first mail a copy of the complaint to the Defendant by first-class mail and request that the Defendant waive formal service of summons. Fed. R. Civ. P. 4(d); Local R. 4.7. Individual and corporate defendants have a duty to avoid unnecessary costs of serving the summons, and any such defendant who fails to comply with the request for waiver must bear the costs of personal service unless good cause can be shown for the failure to return the waiver. Fed. R. Civ. P. 4(d)(2). Generally, a defendant who timely returns the waiver is not required to answer the

complaint until sixty (60) days after the date that the marshal sent the request for waiver. Fed. R. Civ. P. 4(d)(3).

**IT IS FURTHER ORDERED** that Defendants are hereby granted leave of court to take the deposition of the Plaintiff upon oral examination. Fed. R. Civ. P. 30(a). Defendants are further advised that the Court's standard 140 day discovery period will commence upon the filing of the last answer. Local R. 26.1. Defendants shall ensure that all discovery, including the Plaintiff's deposition and any other depositions in the case, is completed <u>within that discovery period</u>.

In the event that Defendants take the deposition of any other person, Defendants are ordered to comply with the requirements of Federal Rule of Civil Procedure 30. As the Plaintiff will likely not be in attendance for such a deposition, Defendants shall notify Plaintiff of the deposition and advise him that he may serve on Defendants, in a sealed envelope, within ten (10) days of the notice of deposition, written questions the Plaintiff wishes to propound to the witness, if any. Defendants shall present such questions to the witness seriatim during the deposition. Fed. R. Civ. P. 30(c).

<u>**INSTRUCTIONS TO PLAINTIFF**</u>

**IT IS FURTHER ORDERED** that Plaintiff shall serve upon Defendants or, if appearance has been entered by counsel, upon their attorneys, a copy of every further pleading or other document submitted for consideration by the Court. Plaintiff shall include with the original paper to be filed with the Clerk of Court a certificate stating the date on which a true and correct copy of any document was mailed to Defendants or their counsel. Fed. R. Civ. P. 5. "Every pleading shall contain a caption setting forth the name of the court, the title of the action, [and] the file number." Fed. R. Civ. P. 10(a).

Plaintiff is charged with the responsibility of immediately informing this Court and defense counsel of any change of address during the pendency of this action. Local R. 11.1. Plaintiff's failure to notify the Court of a change in his address may result in dismissal of this case.

Plaintiff has the responsibility for pursuing this case. For example, if Plaintiff wishes to obtain facts and information about the case from Defendants, Plaintiff must initiate discovery. See generally Fed. R. Civ. P. 26 *et seq.* The discovery period in this case will expire 140 days after the filing of the last answer. Local R. 26.1. Plaintiff does not need the permission of the Court to begin discovery, and Plaintiff should begin discovery promptly and complete it within this time period. Local R. 26.1. Discovery materials should **not** be filed routinely with the Clerk of Court; exceptions include: when the Court directs filing; when a party needs such materials in connection with a motion or response, and then only to the extent necessary; and when needed for use at trial. Local R. 26.4.

Interrogatories are a practical method of discovery for incarcerated persons. See Fed. R. Civ. P. 33. Interrogatories may be served only on a party to the litigation, and, for the purposes of the instant case, this means that interrogatories should not be directed to persons or organizations who are not named as Defendants. Interrogatories are not to contain more than twenty-five (25) questions. Fed. R. Civ. P. 33(a). If Plaintiff wishes to propound more than twenty-five (25) interrogatories to a party, Plaintiff must have permission of the Court. If Plaintiff wishes to file a motion to compel, pursuant to Federal Rule of Civil Procedure 37, he should first contact the attorneys for Defendants and try to work out the problem; if Plaintiff proceeds with the motion to compel, he should also file a statement certifying that he has

contacted opposing counsel in a good faith effort to resolve any dispute about discovery. Fed. R. Civ. P. 26(c); 37(a)(2)(A); Local R. 26.7.

Plaintiff has the responsibility for maintaining his own records of the case. If Plaintiff loses papers and needs new copies, he may obtain them from the Clerk of Court at the standard cost of fifty cents ($.50) per page. **If Plaintiff seeks copies, he should request them directly from the Clerk of Court and is advised that the Court will authorize and require the collection of fees from his prison trust fund account to pay the cost of the copies at the aforementioned rate of fifty cents ($.50) per page.**

If Plaintiff does not press his case forward, the court may dismiss it for want of prosecution. Fed. R. Civ. P. 41; Local R. 41.1.

It is Plaintiff's duty to cooperate fully in any discovery which may be initiated by Defendants. Upon no less than five (5) days' notice of the scheduled deposition date, the Plaintiff shall appear and permit his deposition to be taken and shall answer, under oath or solemn affirmation, any question which seeks information relevant to the subject matter of the pending action. Failing to answer questions at the deposition or giving evasive or incomplete responses to questions will not be tolerated and may subject Plaintiff to severe sanctions, including dismissal of this case.

As the case progresses, Plaintiff may receive a notice addressed to "counsel of record" directing the parties to prepare and submit a Joint Status Report and a Proposed Pretrial Order. A plaintiff proceeding without counsel may prepare and file a unilateral Status Report and is required to prepare and file his own version of the Proposed Pretrial Order. A plaintiff who is incarcerated shall not be required or entitled to attend any status or pretrial conference which may be scheduled by the Court.

## ADDITIONAL INSTRUCTIONS TO PLAINTIFF REGARDING
## MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT

Under this Court's Local Rules, a party opposing a motion to dismiss shall file and serve his response to the motion within fourteen (14) days of its service. "Failure to respond shall indicate that there is no opposition to a motion." Local R. 7.5. Therefore, if Plaintiff fails to respond to a motion to dismiss, the Court will assume that he does not oppose the Defendants' motion. Plaintiff's case may be dismissed for lack of prosecution if Plaintiff fails to respond to a motion to dismiss.

Plaintiff's response to a motion for summary judgment must be filed within twenty-one (21) days after service of the motion. Local R. 7.5, 56.1. The failure to respond to such a motion shall indicate that there is no opposition to the motion. Furthermore, each material fact set forth in the Defendants' statement of material facts will be deemed admitted unless specifically controverted by an opposition statement. Should Defendants file a motion for summary judgment, Plaintiff is advised that he will have the burden of establishing the existence of a genuine dispute as to any material fact in this case. That burden cannot be carried by reliance on the conclusory allegations contained within the complaint. Should the Defendants' motion for summary judgment be supported by affidavit, Plaintiff must file counter-affidavits if he desires to contest the Defendants' statement of the facts. Should Plaintiff fail to file opposing affidavits setting forth specific facts showing that there is a genuine dispute for trial, any factual assertions made in Defendants' affidavits will be accepted as true and summary judgment may

be entered against the Plaintiff pursuant to Federal Rule of Civil Procedure 56.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 17th day of July, 2018.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA