IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

DAMON YOUNG,                          *
                                      *
        Plaintiff,                    *
                                      *      CIVIL ACTION NUMBER:
v.                                    *      6:17-CV-131-RSB-BWC
                                      *
Warden MARTY ALLEN, *et al*.,         *
                                      *
        Defendants.                   *

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## I.  PROCEDURAL HISTORY

Damon Young ("Plaintiff" or "Young") filed his Complaint on October 2, 2017 alleging that defendant Tarmarshe Smith who worked at Smith State Prison ("Smith" or "SSP"), and defendants Marty Allen, Trevonza Bobbitt, and Joseph Hutchinson, who all worked at Georgia State Prison ("GSP") conspired to, and violated, his religious rights.  (Doc. 1, pp. 5, 6-13).

On March 2, 2018, Plaintiff filed an Amended Complaint adding new claims against existing Defendants and also adding Defendants Marsha Gillis, Aaron Pinerio, and Ronnie Shoemake.  (Doc. 12).

On July 17, 2018, the Magistrate Judge issued a report and recommendation on Plaintiff's Complaints.  (Doc. 17).  The Magistrate Judge dismissed Plaintiff's official capacity claims for damages; Plaintiff's Religious Land Use and Institutionalized Persons Act ("RLUIPA") compensatory and punitive damages claims; and Plaintiff's First Amendment, Fourteenth Amendment, and conspiracy claims for compensatory and punitive damages.  (*Id.*, p. 38).  However, the Magistrate Judge allowed Plaintiff to proceed with the following claims:

- RLUIPA claims against Defendants Allen, Bobbitt, Hutchinson and Smith (*Id.*, p. 17);

- First Amendment free exercise claims against Defendants Allen, Bobbitt, Hutchinson and Smith (*Id.*, p. 19);

1

- First Amendment establishment clause claims against Defendants Allen, Bobbitt and Hutchinson (*Id.*, p. 20);

- First Amendment retaliation for filing grievances claims against Defendants Allen, Bobbitt, Hutchinson, Piniero, Shoemake and Smith (*Id.*, p. 22);

- First Amendment retaliation for free exercise of religion claims against Defendants Allen, Bobbitt, Hutchinson, Shoemake and Smith (*Id.*);

- Sections 1983 and 1985(3) conspiracy claims against Defendants Allen and Smith (*Id.*, pp. 28-29);

- Fourteenth Amendment equal protection claims against Defendants Allen, Bobbitt, Hutchinson, Pinerio, Shoemake and Smith (*Id.*, p. 24);

- Fourteenth Amendment procedural due process claims against Defendants Allen, Hutchinson and Shoemake (*Id.*, p. 26); and

- Eighth Amendment deliberate indifference to serious medical needs claims against Defendants Allen, Gillis, and Pinerio.[1]  (*Id.*, p. 36).

On August 24, 2018, the Court adopted the Magistrate Judge's report and recommendation. (Doc. 27).

## II.   THE FACTS FOR SUMMARY JUDGMENT[2]

Plaintiff, who is serving a twenty-year sentence, has been housed at GSP since January 24, 2017. (SMF, ¶¶ 1, 9).  Plaintiff was housed at SSP from September 6, 2016 through January 24, 2017.  (SMF, ¶ 10).  Before SSP, Plaintiff was at Autry State Prison.  (SMF, ¶ 12).

---

[1]The Magistrate Judge also recommended that Plaintiff's Eighth Amendment deliberate indifference to serious medical needs claims against Defendants DeGroot and Reno proceed.  (Doc. 17, p. 36).  However, those Defendants are represented by attorney David Johnson.  (Doc. 35).

[2] Defendants have submitted a Statement of Material Facts ("SMF") as required by L.R. 56.  The facts are presented here in summarized and abbreviated form for the Court's convenience.  Defendants do not necessarily concede that all of these facts accurately describe what occurred, but they submit that these are the operative facts for purposes of summary judgment.  "[T]he 'facts,' as accepted for purposes of summary judgment, may not be the actual facts of the case …" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

Plaintiff was transferred from Autry to SSP because he was found guilty of "introducing cell phones and tobacco" into Autry and was assigned to the Tier II program.  (SMF, ¶ 13).

There are significant limitations on what an inmate assigned to Tier II is allowed to have, with the limitations easing as the inmate progresses through the program.  (SMF, ¶ 18).  Placement in Tier II, and movement through the program, is decided by the Classification Committee.  (SMF, ¶¶ 16, 17).  Once an inmate is assigned to Tier II, his assignment is reviewed every ninety (90) days by the Committee, which decides if the inmate progresses, remains at the same Phase, or gets demoted to a lower Phase.  (SMF, ¶ 17).  Movement through the program is determined by the inmate's behavior and ability to adjust.  (*Id.*).  Plaintiff was housed at Smith for approximately five months, and during that time he had a ninety-day review and was moved from Phase 1 to Phase 2 of Tier II.  (SMF, ¶¶ 11, 21-27).

Plaintiff's only complaint against Defendant Smith, who was the Deputy Warden of Security at SSP, relates to Defendant Smith preventing Plaintiff from smoking Crazy Crow's Kinni-kinnick.  (SMF, ¶¶ 2, 27).  Plaintiff brought ten packs of Kinni-kinnick with him from Autry to SSP.  (SMF, ¶ 28).  For a while, he freely used his Kinni-kinnick during his religious exercises.  (*Id.*).  Plaintiff's Kinni-kinnick contained tobacco leaves.  (SMF, ¶ 34).  Other inmates at SSP wanted to smoke tobacco using the Native American religion as pretense.  (SMF, ¶ 29).  Plaintiff had similar experiences at Autry where inmates claimed to practice the Native American religion in order to smoke tobacco.  (SMF, ¶ 32).

Defendant Smith expressed his concerns to Plaintiff about other inmates wanting to smoke tobacco at SSP.  (SMF, ¶ 30).  A week later, Defendant Smith informed Plaintiff that he was no longer allowed to use Kinni-kinnick that contained tobacco and told Plaintiff that Plaintiff had to get tobacco-free Kinni-kinnick, and that he did not care how Plaintiff got it or from where.  (SMF, ¶ 33).

The Georgia Department of Corrections ("GDC") banned smoking tobacco in all of its facilities in order to promote a healthy environment and to eliminate the black-market sale of tobacco in its prisons.  (SMF, ¶ 36).  Tobacco-free Kinni-kinnick exists.  (SMF, ¶ 37).  However, Plaintiff's preferred vendor, Crazy Crow Trading Post, only sells Kinni-kinnick with tobacco.  (SMF, ¶¶ 40-41).  Smith refused to allow Plaintiff to use Kinni-kinnick with tobacco from Crazy Crow.  (SMF, ¶ 42).  Plaintiff did not go out

3

to pray at SSP because he had no Kinni-kinnick.  (SMF, ¶ 43).  No one at SSP ever prevented Plaintiff from going out to pray.  (*Id.*).

As Plaintiff was leaving SSP, Smith met with him to give him his property to take with him to GSP.  (SMF, ¶ 44).  Smith told Plaintiff that Plaintiff could not take his "Cherokee Mellow tobacco," or his Kinni-kinnick from Crazy Crow, and that those items would be sent to his home address instead. (SMF, ¶ 45).  Plaintiff responded that Defendant Allen, the Warden at GSP, knew him and had allowed him to use Crazy Crow's Kinni-kinnick.  (SMF, ¶ 46).  Defendant Smith then had a conversation with Defendant Allen, and Smith told Plaintiff that Plaintiff would not be allowed to use Crazy Crow's Kinni-kinnick at GSP.  (SMF, ¶ 47).  About a week after Plaintiff arrived at GSP, Defendant Allen told Plaintiff that he had spoken to Defendant Smith and that Plaintiff would not be allowed to smoke Crazy Crow's Kinni-kinnick at GSP.  (SMF, ¶¶ 48, 49).  Subsequently, Plaintiff used tobacco-free Kinni-kinnick at GSP, which he had ordered from Noc Bay.  (SMF, ¶¶ 38, 39).  However, Plaintiff found that experience unsatisfying because the tobacco-free Kinni-kinnick "didn't do nothing."  (SMF, ¶ 38).

When Plaintiff arrived at GSP, he was placed in Phase 1 of Tier II, and his choices of religious texts were limited to a Bible, a Koran, or no texts.  (SMF, ¶ 52).  This limitation applied to all inmates assigned to Phases 1 and 2, regardless of religious affiliation, and Plaintiff was not required to have a Bible or Koran.  (SMF, ¶ 53, 54).  Although Plaintiff could have ordered religious pamphlets, he chose to have no religious texts at all.  (SMF, ¶¶ 54, 55).

Plaintiff claims that soon after he arrived at GSP, Defendant Allen had a false disciplinary report written against him when a "honey bun and some other items" were found in Plaintiff's cell.  (SMF, ¶ 71).  Because Plaintiff was assigned to Phase 1, he was not allowed to have these items.  (SMF, ¶ 72).

While in Tier II, Plaintiff had the same yard time, meals, and showers as all other inmates in the program.  (SMF, ¶¶ 58-59).  Moreover, inmates in the different Phases were all housed together, with the only difference being the amount of personal property inmates were allowed to have consistent with their Phase assignment.  (SMF, ¶ 60).  Plaintiff received his ninety-day reviews while in Tier II at GSP;

however he complains that those hearings were either premature or did not fully comport with the Tier II Standard Operating Procedure ("SOP").  (SMF, ¶ 61).

Plaintiff progressed through Tier II at GSP, and was in Phase 3, when he was approved for a paralegal course.  (SMF, ¶ 63).  However, on August 23, 2017, after a hearing by the Classification Committee, Plaintiff was found guilty of possessing contraband and was consequently reassigned to the more restrictive Phase 1.  (SMF, ¶ 64).

Plaintiff was transferred from SSP to GSP because he was assigned to the mental health case load.  (SMF, ¶ 75).  But Plaintiff found the mental health care that he received from Defendant Gillis, who was his mental health counselor, lacking.  (SMF, ¶ 76).  Defendant Gillis held weekly counseling sessions with Plaintiff through Plaintiff's cell door.  (SMF, ¶ 77).

## III.     ARGUMENT AND CITATION OF AUTHORITY

### A.     Standard for summary judgment.

Defendants are entitled to summary judgment if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  FED. R. CIV P. 56(c).  If the non-moving party bears the ultimate burden of proof regarding the claim at issue in the motion, that party, in response to the motion, must go beyond the pleadings and establish, through competent evidence, that there truly is a genuine, material issue to be tried.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Additionally, the non-moving party must present enough evidence to demonstrate that it can meet the substantive evidentiary standards that apply to the case, that is, that a jury might return a verdict in his favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

"Summary judgment is designed to weed out those cases . . . so clearly lacking in merit that the full trial process need not be activated to resolve them."  *Holley v. Northrop Worldwide Aircraft Services, Inc.*, 835 F.2d 1375, 1377 (11th Cir. 1988).  This is one of those cases.

**B.    Plaintiff failed to exhaust administrative remedies before filing his lawsuit.**

**1.    The exhaustion requirement.**

The Prison Litigation Reform Act of 1995 (PLRA or Act) requires an inmate to exhaust all available administrative remedies before filing suit.  The Act provides:

> No action shall be brought with respect to prison conditions under
> Section 1979 of the revised statutes of the United States, 42 U.S.C.
> § 1983, or any other federal law, by a prisoner confined in any jail,
> prison, or other correctional facility until such administrative remedies as
> are available are exhausted.

42 U.S.C. § 1997e(a).

Thus, "when a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit."  *Johnson v. Meadows*, 418 F.3d 1152, 1156 (11th Cir. 2005) (quoting *Brown v. Sikes*, 212 F.3d 1205, 1207 (11th Cir. 2000)).  Further, what is required is "proper exhaustion," meaning actual compliance with the procedural rules and deadlines as set forth in the applicable state grievance system.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  This means that a prisoner must use all of the administrative options that the state offers and take each step in the administrative process. *Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008).  Procedurally defective grievances or appeals are not adequately exhausted.  *Bracero v. Sec'y, Fla. Dep't of Corr.*, 2018 U.S. App. LEXIS 22495, *3 (11th Cir. 2018)(*citing* to *Woodford*, 548 U.S. at 93-95).  Exhaustion is mandatory under the PLRA, and unexhausted claims cannot be brought in court.  *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524(2002)).

The only historical date that is "pertinent to determining whether a prisoner satisfied the PLRA's exhaustion requirement," is the date the plaintiff filed his original complaint.  *Terry v. Smith*, 491 Fed. Appx. 81, 83 (11th Cir. 2012).  Here, Plaintiff filed his original Complaint on October 2, 2017.  This means that Plaintiff had to have exhausted the administrative remedies with respect to all of his claims before October 2, 2017.  Moreover, in order to address an inmate's complaints before a lawsuit is filed, at a minimum a grievance must provide at least enough information to place prison officials on notice of the

prisoner's claims and allow them a reasonable opportunity to investigate those claims.  *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004).

>    2.    **GDC's grievance process.**

GDC maintains a grievance procedure by which GSP's inmates may resolve alleged problems. (Exhibit D, Declaration of Aaron Pinerio, ¶ 5).  All inmates at GSP are provided an oral explanation of the grievance procedure upon entering GSP.  (*Id.*, ¶ 6).  Additionally, all inmates are provided a copy of the grievance procedure in their Orientation Handbook and can also access the procedures at GSP's library.  (*Id.*).

The grievance SOP has two steps.  First, the inmate files the Original Grievance.  Second, the inmate may appeal the findings of the Original Grievance with the Central Office of Appeal.  (*Id.*, ¶ 8). The grievance SOP details the procedures, and timelines, for each step.  (*Id.*)

The GDC's grievance SOP provides that an inmate must submit their written grievance no later than ten (10) calendar days from the date they knew, or should have known, of the facts giving rise to their grievance.  (*Id.*, ¶ 9).  Each grievance must relate to a single issue or incident.  (*Id.*, ¶ 16).  After the Grievance Coordinator screens the inmate's grievance, it is then assigned to a staff member to thoroughly investigate the allegations.  (*Id.*, ¶ 11).  The investigator must complete a report, attaching all relevant documentations, and submit it to the Grievance Counselor.  (*Id.*).  The Grievance Counselor then forwards that report to the Warden.  (*Id.*).  The Warden, after reviewing the report(s), must issue a decision in writing and must state the reasons for his decision within forty (40) days.  (*Id.*, ¶ 12).  The Grievance Counselor must then give the Warden's written decision to the inmate.  (*Id.*).

If the inmate is unsatisfied with the Warden's decision, he must then move to the second step of appealing to the Central Office of Appeal.  Inmates have seven (7) calendar days from the date they receive the Warden's response to their original grievance to file an appeal.  (*Id.*, ¶13).  The Commissioner, or his designee, has one hundred (100) calendar days after receipt of the grievance appeal to deliver a decision to the inmate.  (*Id.*, ¶ 14).  The grievance process is exhausted when the Grievance Counselor notifies the inmate of the written response from the Commissioner or his designee.  (*Id.*, ¶ 15).

GDC's procedures do not contain any provisions allowing detainees to bypass the grievance process or ignore its timelines.  (*Id*., ¶ 17).

In 2017, allegations that an inmate's religious rights were being violated, that an inmate suffered from retaliation for exercising his First Amendment rights, that an inmate was being denied needed medical care, that there was a conspiracy between Wardens to infringe an inmate's constitutional rights, and that an inmate was treated worse than other similarly situated inmates, were all grievable pursuant to the grievance SOP described above.  (*Id.*, ¶ 18).

One matter not covered by the grievance procedure is an inmate's classification and placement into the Tier II program.  (*Id.*, ¶ 19).  Tier II is governed by its own SOP.  (*Id.*).  Placement in Tier II, and assignment to the various Phases of Tier II, are decided by the Classification Committee.  (*Id.*, ¶ 20).  The Warden has seven (7) days to approve or deny the Committee's classification.  (*Id.*, ¶ 21).  An inmate may appeal the Warden's decision to the Director of Field Operations within three (3) days of receiving the Warden's decision.  (*Id.*,       ¶ 22).  The Director of Field Operations has fourteen (14) days to respond to the inmate's appeal.  (*Id.*).  Appeals of Tier II classifications are only exhausted when the inmate receives a response from the Director of Field Operations or after the expiration of the fourteen days.  (*Id.*).

### 3.     Plaintiff's Grievances.

#### a.     *Plaintiff did not exhaust all of his RLUIPA and free exercise claims.*

Defendants concede that Plaintiff exhausted the administrative remedies at SSP with respect to his RLUIPA and free exercise claims against Defendant Smith based on his allegation that Defendant Smith did not allow him to have Kinni-kinnick from Crazy Crow during his religious observances.  (See Exhibit E, Grievance No. 235321).  However, Plaintiff failed to exhaust the administrative remedies at GSP against all other defendants with respect to his RLUIPA and free exercise claims.

The first grievance Plaintiff filed at GSP relating to his religious claims was on February 15, 2017, in which he complained that he was not being taken out to pray and that he was not being allowed to have Kinni-kinnick unless the company providing it also provided a list of ingredients.  (Exhibit D

("Pinerio Decl."), ¶ 29)(*see also* Attachment D-5, Grievance No. 238182).  That grievance was partially granted and Plaintiff was given recreation time to worship, and was provided with a form to order Kinni-kinnick.  Plaintiff did not appeal the local disposition of this grievance with the Central Office.  (*Id.*).

Plaintiff next filed Grievance Number 240144 on March 21, 2017, complaining that his cell was searched and his religious books were taken away from him in retaliation for filing grievances.  (*Id.*, ¶ 30)(*see also* Attachment D-6, Grievance No. 240144).  This grievance was denied because Plaintiff was not allowed to have those materials in Phase 1 of Tier II, and Plaintiff did not appeal the local disposition of this grievance with the Central Office.  (*Id.*).

Also on March 21, 2017, Plaintiff filed Grievance Number 240146 in which he complained that he was not allowed to have his sacred items during his prayers.  (*Id.*, ¶ 31)(*see also* Attachment D-7, Grievance No. 240146).  After an investigation, this grievance was also denied at the local level and Plaintiff did not appeal.  (*Id.*).  Finally, on April 20, 2017, Plaintiff filed Grievance Number 241693 complaining that he had ordered certain religious items in the mail and that he received everything but a blanket and Kinni-kinnick.  (*Id.*, ¶ 32)(*see also* Attachment D-8, Grievance No. 241693).  Even though this grievance was untimely, it was rejected because Plaintiff's Kinni-kinnick had tobacco, and the blanket was larger than authorized.  (*Id.*).  Again, Plaintiff did not appeal this local disposition of his grievance to the Central Office.  (*Id.*).  These are the only grievances Plaintiff filed during 2017 dealing with any religious claims.  (*Id.*, ¶35).  Plaintiff never appealed the local disposition for any of these grievances to the Central Office of Appeal.  (*Id.*).  Accordingly, Plaintiff failed to exhaust the administrative remedies available at GSP with respect to his RLUIPA and free exercise claims against Defendants Allen, Bobbitt and Hutchinson.  (*Id.*).

> b.   *Plaintiff never grieved his establishment clause claims.*

Plaintiff testified that he first became aware that he was limited to the choice of a Bible or a Koran in Phases 1 and 2 of Tier II at the beginning of February, 2017.  (SMF, ¶ 52)(Exhibit A ("Young Depo."), 101: 17-22).   Yet, Plaintiff filed two grievances in February of 2017, and never complained about having access to only a Bible or Koran.  (Exhibit D, ¶¶ 27-29)(*see also*, Exhibits D-3 (Grievance

History), D-4, and D-5).  In fact, there is no evidence that Plaintiff ever grieved this claim.  (Exhibit D, ¶ 35).

<em>c.    Plaintiff did not exhaust his conspiracy claims.</em>

On February 15, 2017, Plaintiff field Grievance Number 238182 in which he complained about an inability to get Kinni-kinnick from Crazy Crow Trading Post.  (Exhibit D, ¶ 29)(Exhibit D-5).  In the narrative of his grievance, Plaintiff wrote that on "Monday, January 30, 2017 Warden Allen came to my cell and told me that he talked to Deputy Warden Smith at Smith State Prison and I would not be allowed to have my Kinni-kinnick unless the company that sent it also sent a list of how it was made." (Exhibit D-5).  By way of resolution, Plaintiff sought to order Kinni-kinnick from Crazy Crow.  (*Id.*).  Plaintiff made no allegations that Defendants Allen and Smith conspired to violate his constitutional rights.  (*Id.*).  Thus, neither the prison nor those defendants could have been placed on notice of Plaintiff's conspiracy claims in order to remedy said complaints through the grievance process. *See Brown v. Sikes*, 212 F.3d 1205, 1207–08 (11th Cir. 2000) ("[I]mplicit in [the exhaustion] requirement is an obligation on the prisoner to provide those officials who will pass upon the grievance all the relevant information he has.").

Moreover, even if this grievance could be construed as alleging a conspiracy between Defendants Allen and Smith, as discussed above, Plaintiff did not exhaust the grievance process with respect Grievance Number 238182 since he did not appeal the local disposition to the Central Office. (Exhibit D, ¶ 35).

<em>d.    Plaintiff did not exhaust his retaliation claims.</em>

On March 21, 2017, Plaintiff filed Grievance Number 240144, in which he complained that Defendant Allen searched his cell and took his Native American books in retaliation for Plaintiff filing grievances.  (Exhibit D, ¶ 30)(Exhibit D-6).  Plaintiff did not allege that Defendant Allen retaliated against Plaintiff for practicing his religion.  (Exhibit D-6).  In any event, as discussed above, Plaintiff did not exhaust the administrative remedies with respect to his retaliation claims because he did not appeal the local disposition of this grievance.  (Exhibit D, ¶ 35).

10

> e.   *Plaintiff did not exhaust his equal protection claims.*

Plaintiff claims that Defendants intentionally discriminated against him, as compared to other similarly situated inmates, when they denied him the same opportunities to pray with religious items, they confined him in Tier II without the same due process, they precluded him from having the same religiously significant texts, and they prohibited him from taking the same paralegal course.  (Doc. 17, p. 24).

As discussed above, Plaintiff failed to exhaust his claims relating to GSP Defendants' not allowing him to pray with Crazy Crow's Kinni-kinnick, and he also failed to exhaust his claims relating to having access to only a Bible or a Koran while in Phases 1 and 2 of Tier II.  Further, Plaintiff was not placed in Tier II by Defendants (SMF, ¶¶ 13, 21), and as discussed below, Plaintiff did not exhaust his administrative remedies at GSP with respect to his Tier II classifications.  Finally, Plaintiff did not exhaust his claims with respect to his August 23, 2017 Tier II hearing, and his claims with respect to his paralegal course, until March 1, 2018.  (SMF, ¶ 82).  Plaintiff filed his lawsuit on October 2, 2017, and therefore did not exhaust these claims.

Moreover, the only grievance in which Plaintiff made an equal protection claim was Grievance No. 240144.  (*See* Attachment D-6).  In his grievance, Plaintiff alleged that Defendant Allen took his "date book given by the chaplain that all other inmates in Tier II are allowed to have."  (*Id.*).  However, as noted above, Plaintiff did not appeal the local disposition of this grievance and therefore did not fully exhaust the grievance process.  (Exhibit D, ¶¶ 30, 35).

> f.   *Plaintiff did not exhaust his Eighth Amendment deliberate indifference to serious medical needs claims.*

Plaintiff's Eighth Amendment deliberate indifference to serious medical need claims were not exhausted until March 1, 2018—almost five months after Plaintiff filed his lawsuit on October 2, 2017.  (SMF, ¶ 82).  Although Plaintiff provided the Court with a notice of his intent to amend his Complaint when his claims were fully exhausted (Doc. 8), and then subsequently amended his Complaint on March 2, 2018 (Doc. 12), Courts look to the date on which a plaintiff files his initial complaint to determine

exhaustion of remedies.  *Smith v. Terry*, 491 Fed. Appx. at 83-84; *Harris v. Garner*, 216 F.3d 970, 981 (11th Cir.2000) (en banc) (stating that an amended or supplemental complaint could not cure the original defective complaint because "[n]o amendment or supplement to a pleading can change a historical fact…").

> g.   *Plaintiff did not exhaust his procedural due process claims.*

Plaintiff concedes that he did not exhaust the administrative remedies at GSP with respect to his procedural due process claims stemming from his August 23, 2017 classification hearing.  (SMF, ¶ 82).  However, the evidence is that Plaintiff never appealed any of his Tier II classification hearings while at GSP.  (Exhibit D, ¶ 23)(*see also* Attachment D-2).  Accordingly, Plaintiff failed to exhaust his procedural due process claims.

In sum, Plaintiff failed to exhaust the GDC's administrative remedies with respect to all of his claims except his RLUIPA and free exercise claims against Defendant Smith.

## C.    Plaintiff cannot prove a First Amendment free exercise or RLUIPA violation.

Plaintiff testified that he does not have any RLUIPA or free exercise claims against Defendants Bobbitt and Hutchinson because "they had no authority to approve or deny" his use of Kinni-kinnick.  (SMF, ¶ 74).  That leaves only Defendants Allen and Smith.  (Doc. 17, pp. 17, 19).

In the prison context, the evaluation of a claim under the free exercise clause of the First Amendment involves a two-part inquiry.  First, "a plaintiff must [show] a constitutionally impermissible burden on a sincerely held religious belief . . . ." *GeorgiaCarry.Org., Inc. v. Ga.*, 687 F.3d 1244, 1256 (11th Cir. 2012); *see also Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on a sincerely held religious belief."); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007) (same).  Second, if the plaintiff adequately proves an impermissible burden on a sincerely held religious belief, the court must then conduct a reasonableness inquiry, determining whether the restriction at issue is "reasonably related to legitimate penological interests."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 & 349 (1987) (internal quotation marks omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

12

Under RLUIPA, prison officials may not substantially burden the free exercise of religion unless they use (1) the least restrictive means (2) to further a compelling governmental interest. 42 U.S.C. § 2000cc-1(a).  To prove a RLUIPA claim, the plaintiff must show (1) that he engaged in a religious exercise; and (2) that his religious exercise was substantially burdened.  *Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007).  A plaintiff bears "the initial burden of proving" a policy or action "implicates his religious exercise" and that it "substantially burden[s an] exercise of religion."  *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).  "Once a plaintiff proves that a challenged practice substantially burdens his religious exercise, the burden shifts to the defendant to show that the policy is the least restrictive means of furthering a compelling government interest." *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 532 (11th Cir. 2013) (citing 42 U.S.C. § 2000cc-2(b)) (other citation omitted).

In the Eleventh Circuit, the "substantial burden" prongs of free exercise and RLUIPA claims are often analyzed together, as the standards are similar. *See, e.g., Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226 (11th Cir. 2004) ("The Supreme Court's definition of 'substantial burden' within its free exercise cases is instructive in determining what Congress understood 'substantial burden' to mean in RLUIPA.").

"[A]n individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Midrash Sephardi, Inc.,* 366 at 1226.  "A 'substantial burden' must place more than an inconvenience on religious exercise; a 'substantial burden' is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.* at 1227.  "A demonstration that the Plaintiff has been forced to perform a version of his religious precept that is 'not preferred' is insufficient under the Eleventh Circuit's standard to establish a *prima facie* violation of RLUIPA."  *McCree v. Pocock*, No. 1:06-CV-1279, 2007 U.S. Dist. LEXIS 44594, at *4 (N.D. Ga. June 19, 2007).  Rather, Plaintiff must show he was forced to "for[]go some religious rule of conduct."  *Id.*

Here, Plaintiff alleges that Defendants Allen and Smith substantially burdened his religious rights by preventing him from smoking Kinni-kinnick during religious observances. (SMF, ¶¶ 27, 42); (Doc. 17, pp. 17, 19). For purposes of this motion only, Defendants do not challenge the sincerity of Plaintiff's religious beliefs. However, the evidence belies Plaintiff's claim that his religious rights were substantially burdened.

Neither Defendant Allen nor Defendant Smith prevented Plaintiff from using Kinni-kinnick. (SMF, ¶¶ 28, 39). On the contrary, the evidence is that they told him explicitly that he could order and use Kinni-kinnick so long as it did not have tobacco. (SMF, ¶¶ 33, 48).

Tobacco is banned in all GDC's prison in order to create a healthy environment for everyone, and to eliminate the black-market sale of tobacco. (SMF, ¶ 36). Tobacco-free Kinni-kinnick exists (SMF, ¶ 37), and Plaintiff used a version of it at GSP in the Fall of 2018. (SMF,  ¶ 38). Thus, Plaintiff was not prevented from ordering or using tobacco-free Kinni-kinnick. Plaintiff merely preferred Kinni-kinnick from Crazy Crow which contained tobacco. (SMF, ¶¶ 40, 41). This mere preference is insufficient to show a substantial burden on his religious practice. *Midrash Sephardi, Inc.,* 366 F.3d at 1227 (a "substantial burden" must place more than an inconvenience on religious exercise); *see also Bowen v. Roy*, 476 U.S. 693, 707-08 (1986)(finding no substantial burden where government action interfered with, but did not coerce, an individual's religious beliefs).

Even if Plaintiff could prove a substantial burden on his First Amendment free exercise rights, the ban on Kinni-kinnick with tobacco is reasonably related to the legitimate penological interest of creating a healthy environment and ending the black-market sale of tobacco. *Turner v. Safley*, 482 U.S. at 89. In determining whether a restriction is reasonably related to legitimate penological interests, a court must weigh: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally;" and (4) the "absence of ready alternatives," or, in other words, whether the rule is an "exaggerated response to

14

prison concerns." *Turner*, 482 U.S. at 89-90. The ultimate burden is on the plaintiff to disprove the validity of the regulation or decision. *Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S. Ct. 2162, (2003).

Here, the ban on Kinni-kinnick with tobacco easily survives *Turner's* four-prong analysis. First, it is a rational and valid way of creating a healthy environment, preventing the dangers of second-hand smoking, and eliminating security threats associated with the black-market for tobacco in prisons. (SMF, ¶ 36). Second, the undisputed evidence is that Plaintiff has access to tobacco-free Kinni-kinnick, and is allowed to use it, but has chosen not to do so because it "didn't do nothing." (SMF, ¶ 38). Third, allowing Plaintiff to smoke tobacco would significantly impact the safe and secure operation of the prison because, as Plaintiff testified, other inmates would use the Native American religion as pretense to obtain, trade, and smoke tobacco. (SMF, ¶¶ 29-32). Finally, as already discussed, Plaintiff has access to a "ready alternative" in the form of tobacco-free Kinni-kinnick. (SMF, ¶¶ 37-40).

With respect to Plaintiff's RLUIPA claims, assuming that he can prove that his rights were substantially burdened, the evidence is that the ban on tobacco is narrowly tailored to further a compelling interest. Prison security, stemming from the black-market sale of tobacco, "is a compelling state interest and deference is due to institutional officials' expertise in this area." *Holt v. Hobbs*, 135 S. Ct. 853, 897 (2015). In the dangerous prison environment, "regulations and procedures" are needed to "maintain good order, security and discipline…" *Id.* (*citing Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)). Moreover, the complete ban on tobacco is narrowly tailored. When Plaintiff was allowed to smoke Kinni-kinnick with tobacco at Autry and SSP, other inmates began requesting tobacco using Plaintiff's religion as pretense. (SMF, ¶¶ 29, 32). Thus, tobacco-free prisons could not be achieved by narrower means that burden religion in a lesser degree. *United States v. Sec'y Fla. Dep't of Corr.*, 828 F.3d 1341, 1349 (11th Cir. 2016). Defendants are entitled to summary judgment because the undisputed facts are that Defendants did not violate Plaintiff's RLUIPA[3] or free exercise rights.

---

[3] Plaintiff cannot assert any claims for damages, even nominal damages, for a purported RLUIPA violation. *See Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007)("RLUIPA cannot be construed as creating a private action against individual defendants for money damages.").

**D.      Plaintiff cannot prove 42 U.S.C. § 1983 and § 1985 conspiracy claims.**

In a §1983 conspiracy claim, Plaintiff must prove that a conspiracy existed and that it resulted in the actual denial of some underlying constitutional right. *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010)(quoting *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998)).  A plaintiff claiming a § 1983 conspiracy must prove the defendants "reached an understanding" to violate the plaintiff's constitutional rights. *Id. (citing to Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1122 (11th Cir. 1992)("[T]he linchpin for conspiracy is agreement.").

Likewise, for a claim under § 1985(3), Plaintiff is required to prove:  (1) a conspiracy, (2) for the purpose of depriving any person equal protection either directly or indirectly, as well as (3) an act in furtherance of the conspiracy, (4) through which the person is deprived a right or privilege as a United States citizen. *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001).

Here, Plaintiff claims that Defendants Allen and Smith conspired over the telephone to deprive him of his RLUIPA and free exercise rights, and that they furthered the conspiracy by prohibiting his religious use of Kinni-kinnick during prayers.  (Doc. 17, p. 29).  However, as established above, the evidence is that Defendants never prevented Plaintiff from using tobacco-free Kinni-kinnick, (SMF, ¶¶ 28, 38, 39) and merely enforced GDC's policies prohibiting tobacco in its prisons.  (SMF, ¶¶ 33, 36).  Accordingly, Plaintiff cannot prove a Section 1983 and 1985(3) violation because he cannot show that he was denied any constitutional right.  Plaintiff does not claim, nor could he, that he has a constitutional right to access a banned substance in prison.

**E.      Plaintiff cannot prove a First Amendment retaliation violation.**

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  To prove a retaliation, an inmate needs to show (1) that his speech or act was constitutionally protected, (2) that he suffered an adverse action from prison officials that would deter a person of ordinary firmness from engaging in such speech or act, and (3) that the protected speech or conduct and adverse action were causally connected.  *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).  "[O]nce the plaintiff ... establish[es]

that his protected conduct was a motivating factor behind any harm, the burden shifts to the defendant.   If the defendant can show that he would have taken the same action in the absence of the protected activity, he ... prevail[s] on summary judgment." *Smith v. Governor for Alabama*, 562 Fed. Appx. 806, 815 (11th Cir. 2014).

Plaintiff's retaliation claims are only against Defendant Allen.  (SMF, ¶¶ 66-70)(Young Depo., 160: 17-24).  Specifically, Plaintiff claims that Defendant Allen retaliated against him for filing grievances by "placing and holding him in Tier II segregation without due process, interfering with his religious practices, and denying him access to a paralegal course."  (Doc. 17, p. 22)  Plaintiff also claims that Defendant Allen retaliated against him for exercising his religion by denying him an opportunity to pray, confiscating his sacred religious items, and holding him on a false disciplinary report without due process. (Doc. 17, p. 22).

With respect to Plaintiff's retaliation for filing grievances claims, Defendant Allen was not responsible for assigning Plaintiff to Tier II, and he is not on the Classification Committee that determined Plaintiff's Phase assignments in Tier II.  (SMF, ¶ 13)(Exhibit C, Allen Decl., ¶¶ 11, 14).  Moreover, Plaintiff received due process hearings while in Tier II at GDC; his only complaint is that they were premature and did not fully comport with the SOP.  (SMF, ¶ 61).   As discussed above, Defendant Allen did not interfere with Plaintiff's religious practices when he enforced GDC's policies prohibiting tobacco in its facilities.  (SMF, ¶¶ 36-39).  Further, Defendant Allen approved the paralegal course for Plaintiff, but did not provide Plaintiff with the course material after Plaintiff was reclassified from Phase 3 to Phase 1 of Tier II for possessing contraband.  (SMF, ¶¶ 63-64).  The restrictions on Phase 1 prevented Plaintiff from taking his paralegal correspondence course.  (Allen Decl., ¶ 15-16).

With respect to Plaintiff's retaliation for religious speech claims, again, Plaintiff was not prevented from praying; rather, he was prevented from using tobacco at GSP.  (SMF, ¶¶ 36-39).  Whatever items Defendant Allen removed from Plaintiff's cell were items Plaintiff was not allowed to have because of his Phase assignment in Tier II.  (SMF, ¶¶ 18, 20, 52, 72).  Finally, the allegedly false disciplinary report was

not false at all.  Plaintiff concedes that he was not allowed to have those items in Phase 1 of Tier II.  (SMF, ¶¶ 71-72).

Thus, Defendant Allen is entitled to summary judgment because the undisputed evidence is that he either did not do the allegedly retaliatory act, or he would have taken those same actions absent Plaintiff's protected activity.  *See Smith*, 562 Fed. Appx. at 815 (defendant entitled to summary judgment where he "provided sufficient reasons why the actions would have taken place" notwithstanding the protected activity.).   Moreover, Plaintiff was not deterred from filing grievances after the supposed retaliation by Defendant Allen.  (SMF, ¶ 73).

F.    **Plaintiff cannot prove a First Amendment establishment clause violation.**

The establishment clause of the First Amendment states that "Congress shall make no law respecting the establishment of religion."  U.S. Const. Amend. 1.  A government program is permissible under the establishment clause if (1) the program has a secular legislative purpose; (2) the principal or primary effect is one that neither advances nor inhibits religion; and (3) the program does not foster an excessive government entanglement with religion.  *Holloman v. Harland*, 370 F.3d 1252, 1284 (11th Cir. 2004)(*citing to Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971)).

Plaintiff testified that he does not have any establishment clause claims against Defendants Bobbitt and Hutchinson.  (SMF, ¶¶ 56, 57).  Plaintiff alleges that Defendant Allen violated the establishment clause by "mandating certain Tier II confined prisoners only be allowed access to the Bible or Koran and banning Native American and other religious books."  (Doc. 17, p. 20).  The evidence undermines these allegations.

Initially, the limitation on access to either a Bible or Koran exists only in Phases 1 and 2 of Tier II.  (SMF, ¶ 52).  Moreover, the evidence here is that the limitations in Phases 1 and 2 have a secular purpose of disciplining inmates who violated prison rules, and rewarding those inmates for good behavior by easing said limitations as those inmates progress through the program.  (SMF, ¶¶ 14-15, 17-18).  Furthermore, the limitations in Phases 1 and 2 neither advance nor inhibit religion.  Plaintiff merely had access to a Bible or Koran and was not required to have those, or any, religious books.  (SMF, ¶ 54).  In

fact, Plaintiff chose to not have any religious text at all while in Phases 1 and 2. (*Id.*). Additionally, GSP had a process through which Plaintiff could have ordered religious pamphlets while in Phases 1 and 2. (SMF, ¶ 55). Finally, that limitation applied universally to all inmates in Phases 1 and 2 of Tier II regardless of religious affiliation, at all of GDC's facilities, and was not a decision made by Defendant Allen. (SMF, ¶ 53). Accordingly, summary judgment in favor of Defendant Allen is warranted because the limitations in Phases 1 and 2 of Tier II survive the *Lemon* test scrutiny. *Smith*, 562 Fed. Appx. at 816 (faith based honor dorms permissible because it survived *Lemon* test scrutiny).

### G.    Plaintiff cannot prove a Fourteenth Amendment procedural due process violation.

Section 1983 claims for denial of procedural due process require three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." *Quintanilla v. Bryson*, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). Here, Plaintiff claims that Defendants Allen, Hutchinson and Shoemake deprived him of a liberty interest by keeping him in Tier II without constitutionally adequate process. (Doc. 17, pp. 25-26). The evidence here is that Plaintiff's liberty interest was not implicated, and in any event, he received adequate process.

Plaintiff's placement in Tier II for violating prison rules, by itself, does not implicate a liberty interest. "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *see also Sandin v. Connor*, 515 U.S. 472, 484 (1995)(providing that there is no liberty interest or other right inherent in the Constitution not to be placed in disciplinary segregation); *Chandler v. Baird*, 926 F.2d 1057, 1060 (11th Cir. 1991) (providing that the Due Process Clause does not "create an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters") (quotations and citations omitted).

However, States may create liberty interests by conferring benefits to prisoners such that the deprivation of those benefits imposes an "atypical and significant hardship" on an inmate in relation to the

"ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.  There is no liberty interest and no constitutional violation if the "atypical and significant hardship" standard announced in *Sandin* is not met. *See*, *e.g.*, *Magluta v. Samples*, 375 F.3d 1269, 1282 (11th Cir. 2004).  Moreover, if no constitutionally protected liberty interest is established, a court need not reach the question of what process is due.  *See, e.g., Wilkinson*, 545 U.S.at 221.

Plaintiff's placement in Tier II does not give rise to a protected interest because "discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485-486.  *See also, e.g.*, *Morefield v. Smith*, 404 Fed. Appx. 443 (11th Cir. 2010) (inmate's four year confinement in administrative segregation did not establish a liberty interest); *Al-Amin v. Donald*, 165 Fed. Appx. 733, 737-39 (11th Cir. 2006) (inmate who was housed in administrative segregation for three years did not demonstrate an atypical or significant hardship sufficient to create a liberty interest).

Moreover, the Eleventh Circuit considered the conditions of a special management unit ("SMU"), which were more restrictive than the conditions Plaintiff allegedly faced in Tier II, reasoned that "plaintiff [in that case] regularly received meals and five hours of outdoor recreation time each week, was allowed to shower three times per week, and was allowed to have his personal property," and concluded that the conditions of the SMU did not create an "atypical and significant hardship compared to compared to ordinary prison." *Turner v. Warden, GDCP*, 650 Fed. Appx. 695, 701 (11th Cir. 2016).

Like the inmate in *Turner*, Plaintiff did not suffer for any atypical and significant hardship. Plaintiff had routine yard call, received regular meals and showers, and enjoyed the same conditions as all other inmates in Tier II commensurate with his Phase assignment.  (SMF, ¶¶ 58, 59, 60).  Accordingly, Plaintiff's liberty interest was not infringed and the analysis should end here and summary judgment be granted to Defendants.

However, assuming, *arguendo*, that Plaintiff proved the first prong of the analysis, the evidence is that Plaintiff was provided with due process.  Within a week of arriving at GSP, Plaintiff had a Classification hearing on July 31, 2017.  (SMF, ¶ 62).  Plaintiff then had another hearing ninety days later

in April of 2017.  (*Id.*).  Plaintiff also had hearing in July, August and November of 2017.  (Exhibit D-2 (Young's 2017 Classification Hearings)).  In fact, the uncontroverted evidence is that Plaintiff received routing ninety-day hearings while in Tier II at GSP, but he claims those hearing were either premature or did not fully comport with SOP.  That Plaintiff received his hearings earlier that he would have like does not amount to a constitutional violation.  Similarly, it is well established that a violation of an SOP does not amount to a constitutional violation.  *Toenniges v. Brown*, 672 Fed. Appx. 889, 892 (11th Cir. 2016)(a mere violation of a state rule or law does not constitute a constitutional violation).

### H.      Plaintiff cannot prove a Fourteenth Amendment equal protection violation.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  The Supreme Court has interpreted this clause as "a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).   To establish an equal protection violation, a plaintiff must ultimately prove that (1) he is similarly situated with others who received more favorable treatment, and (2) the discriminatory treatment was based on a constitutionally protected status or interest.  *See Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole & Probation Comm.*, 785 F.2d 929, 932 (11th Cir. 1986).  Proof of discriminatory intent or purpose is required to show a violation of the equal protection clause.  *Village of Arlington Heights v. Matro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  "Discriminatory purpose . . . implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiff testified that he does not have an equal protection claim against Defendant Smith.  (SMF, ¶ 27).  However, Plaintiff claims that the other Defendants discriminated against him when they denied him the same opportunities to pray with religious items, they confined him in Tier II without the same due process, they precluded him from having the same religiously significant texts, and they prohibited him from taking the same paralegal course.  (Doc. 17, p. 24).

21

The evidence is that tobacco is banned in all of GDC's prison, not just at GSP, and no other inmate was allowed to smoke tobacco.  (SMF, ¶ 36)(Exhibit A, Young Depo., 76: 20-22).  Thus, Plaintiff cannot show that similarly situated inmates were able to use tobacco, or any banned substance, for their religious observances.  Moreover, as shown above, the evidence here is that Plaintiff was provided due process through his Classification Committee hearing as other inmates, and the limitations on religious texts in Phases 1 and 2 of Tier II applied to all inmates regardless of religious affiliation.  (SMF, ¶¶ 21-26, 51-53, 61-62).  With respect to his paralegal course, the evidence is that Plaintiff was approved for the course while in the less restrictive Phase 3 of Tier II, but was not able to receive the course material after he was reassigned to the more restrictive Phase 1 because he violated prison rules.  (SMF, ¶ 63-64). Plaintiff has no evidence that other inmates in Phase 1 had access to the paralegal course.  Moreover, the fact that Defendants initially approved the course for Plaintiff while he was in Phase 3 negates any inference of discriminatory intent.

## I.    Plaintiff cannot prove an Eighth Amendment deliberate indifference to serious medical needs violation.

To prove a medical indifference under § 1983, Plaintiff must establish (1) a serious medical need; (2) the Defendants' deliberate indifference to that need; and (3) causation between that indifference and Plaintiff's injuries.  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  Here, Plaintiff serious medical needs were treatments for his mental health.  (SMF,  ¶ 75)(Doc. 12, p. 6).  Defendants, for purposes of this motion only, do not dispute that Plaintiff had a serious medical need.  However, Plaintiff has no evidence that Defendants were deliberately indifferent to said medical needs.

To show deliberate indifference, Plaintiff must provide evidence that Defendants had (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).   Not every claim of inadequate medical treatment states a violation of the Eighth Amendment.  *Id.* at 1254.  Rather, the evidence must show acts or omissions "so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness."  *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir.

1991).  There is no requirement that the medical care provided to an inmate "be perfect, the best obtainable, or even very good."  *Harris*, 941 F.2d at 1510.  "Prison officials who are not medical professionals may 'rely on the decisions of trained professionals concerning the medication and care to be given inmates.'"  *Nair v. Sikes*, 1996 U.S. Dist. LEXIS 20907, 8 (N.D. Ga. 1996) (*quoting Waldrop v. Evans*, 681 F.Supp. 840 (M.D. Ga. 1988)).  Moreover, "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."  *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).  Thus, when "the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985).

Here, Plaintiff merely complains about the adequacy of his care.  (SMF, ¶¶ 76, 77).  The evidence is not that Defendant Gillis ignored Plaintiff's mental health needs and refused to provide him with treatments.  On the contrary, Defendant Gillis provided counseling sessions to Plaintiff at least once every week.  (SMF, ¶ 77)(Young Depo., 173: 6-7).  Further, Plaintiff testified that what he wanted was more time with Defendant Gillis, or counseling from a psychologist, but he was not receiving that because the prison was understaffed.  (Young Depo., 179: 6-11).  Thus, the evidence is that Plaintiff was merely dissatisfied with the care he received.  This is insufficient to prove an Eighth Amendment violation.  *See Harris v. Thigpen*, 941 at 1505 ("Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment.").

To the extent that Plaintiff claims are based on Defendants not following SOP with respect to his mental health care, the "failure to follow procedures does not, by itself, rise to the level of deliberate indifference."  *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000).

Plaintiff's claims against Defendants Allen and Pinerio are based on the theory of *respondeat superior* because of their roles as Warden and Deputy Warden of Care and Treatment, respectively, at GSP.  (SMF, ¶¶ 78, 79).  In a § 1983 suit, "where masters do not answer for the torts of their servants," each government official is only liable for their own conduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677

23

(2009).  An exception to this rule exists where a custom or policy results in deliberate indifference or a history of widespread abuse sufficient to confer notice.  *Barr v. Gee*, 437 Fed. Appx. 865, 875 (11th Cir. 2011).  Here, as shown above, Plaintiff cannot prove deliberate indifference.  Moreover, Plaintiff was seen at least once every week by a mental health counselor at GSP.  (SMF, ¶ 77)(Doc. 12, p. 6).  That Plaintiff found his treatment lacking does not amount to a history of widespread abuse sufficient to overcome the bar against supervisory liability.

### J.      Defendants are entitled to qualified immunity.

Qualified immunity protects governmental defendants sued in their individual capacities so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).  This immunity protects from suit all but the plainly incompetent or those who knowingly violate federal law.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  The relevant question to be answered is the "objective (albeit fact specific) question," of whether a "reasonable officer" would have believed the defendant's action to be lawful in light of clearly established law and the information possessed by the defendant.  *Anderson v. Creighton*, 483 U.S. 635, 641.

The public official must first show that she was acting within the scope of her discretionary authority when the allegedly wrongful acts occurred.  *Vinyard*, 311 F.3d at 1346.  The burden then shifts to the plaintiff to show that immunity is not appropriate.  *Id.*  To carry that burden, the plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  The "salient question" is whether the state of the law at the time of the incident gave the defendant "fair and clear warning" that his conduct with respect to the plaintiff was unconstitutional.  *Id.*  at 746.  Liability only attaches if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *United States v. Lanier*, 520 U.S. 259, 270 (1997).

Here, there is no dispute that Defendants were acting within the scope of their discretionary authority.  However, Plaintiff cannot show that Defendants' actions were clearly unlawful.  *Midrash*

*Sephardi, Inc.,* 366 F.3d at 1227 (a "substantial burden" must place more than an inconvenience on religious exercise); *see Smith*, 562 Fed. Appx. at 815 (defendant entitled to summary judgment on retaliation claims where he "provided sufficient reasons why the actions would have taken place" notwithstanding the protected activity), (faith based honor dorms did not violate establishment clause)(summary judgment warranted in equal protection absent showing of discriminatory intent); *Turner*, 650 Fed. Appx. at 701 (conditions of the SMU where inmates were allowed to have regular means, showers, yard time, some personal property did not implicate a liberty interest); *Harris*, 941 F.2d at 1510 (There is no requirement that the medical care provided to an inmate "be perfect, the best obtainable, or even very good.").  Accordingly, Defendants are entitled to qualified immunity.

**IV.    CONCLUSION.**

For the foregoing reasons, Defendants submit that their motion for summary judgment should be granted.

Respectfully submitted, this the 24th day of April, 2019.

CHRISTOPHER M. CARR     112505
Attorney General

KATHLEEN M. PACIOUS     558555
Deputy Attorney General

SUSAN E. TEASTER   701415
Senior Assistant Attorney General

/s/*Rodney Atreopersaud* 309454
RODNEY ATREOPERSAUD
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this day served the within and foregoing **DEFENDANTS' BREIF**

**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**, by depositing a copy thereof, postage

prepaid, in the United States Mail, properly addressed upon:

Damon Young
GDC #: 1030956
Georgia State Prison
2164 Ga Hwy 147
Reidsville, GA 30499

This the 24th day of April, 2019.

<u>s/Rodney Atreopersaud</u>
Georgia Bar No. 309454
Assistant Attorney General

*Please serve:*
RODNEY ATREOPERSAUD
Dept. of Law, State of Georgia
40 Capitol Square, S.W.
Atlanta, GA 30334-1300
Telephone: (404) 656-3300
Facsimile: (404) 651-5304
Email: ratreopersaud@law.ga.gov